In re EMONS INDUSTRIES, INC., Debtor.

EMONS INDUSTRIES, INC., Plaintiff,

v.

Carol ALLEN, et al., Defendants.

Bankruptcy No. 84–B–10486 (PCB).

Adversary No. 89–6035A.

United States Bankruptcy Court, S.D. New York.

April 17, 1998.

Anderson, Kill, Olick & Oshinsky, by Eric D. Statman, New York City, for Emons Industries.

Law Offices of Sybil Shainwald, P.C., by Sybil Shainwald, Lisa Barnes, New York City, for Defendants.

Sheller, Ludwig & Badey, by Stephen Sheller, Philadelphia, PA, for Defendants.

*MEMORANDUM DECISION GRANTING MOTION FOR SUMMARY JUDGMENT DECLARING THAT SUBSEQUENT DES CLAIMANTS ARE HOLDERS OF CLASS 5A CLAIMS ENTITLED TO A DISTRIBUTION UNDER THE DEBTOR'S CONFIRMED PLAN*

PRUDENCE CARTER BEATTY, Bankruptcy Judge.

This Chapter 11 case was not a traditional one. It presented the need to deal with mass tort claims arising from a line of business long discontinued by the debtor in a situation in which virtually all of the debtor's assets were subject to lien or were leased. The relevant mass tort law was in the process of evolving to create new theories of liability to deal with problems of proof confronting plaintiffs. At the same time, the bankruptcy courts were getting their first cases with mass tort liability issues. This case required a non-traditional response to the problems it presented. The particular approach chosen has worked well in this case but has not, apparently, been used in other cases. The Second Circuit has subsequently approved of other approaches to handling mass torts in bankruptcy cases that are not in conflict with the approach taken here. In this case some twelve years after confirmation, the plan distribution remaining available for ultimate payment to mass tort claimants is sufficient to cover all known and expected claims.

The debtor's Chapter 11 plan of reorganization was confirmed in 1986. In 1989 the debtor commenced this adversary proceeding for a declaratory judgment that the plan and order of confirmation, including the dis-

charge and injunction provisions, apply to the defendants. The defendants assert that they are not bound by the plan or order of confirmation because they did not receive actual notice of the last date for filing claims in the Chapter 11 case. The debtor urges that it is irrelevant that the defendants never received notice of the last date for filing claims (the "bar date") because they are all holders of claims of the type expressly excluded from the scope of the bar date.

The claims for which no bar date was fixed were any claims based on exposure to diethylstilbestrol ("DES")[1] held by those who had not previously sued the debtor and whose identity was otherwise unknown to the debtor at the time the bar date was fixed (hereafter the "Subsequent DES Claimants"). The debtor seeks to have this court limit any distribution on the allowed claims of the Subsequent DES Claimants who are the defendants in this adversary proceeding to the distribution provided in the confirmed plan for other general unsecured claims, all of which were classified as Class 5A claims. The Subsequent DES Claimants want to be able to pursue their claims against the reorganized debtor from whom they believe they could obtain a greater recovery than the distribution provided for Class 5A claims under the confirmed plan, notwithstanding that it would give them a windfall in comparison with the treatment received by other DES Claimants in this Chapter 11 case.

The debtor has moved for summary judgment in its favor. Finding no material facts in dispute and for the reasons which follow, this court concludes that the debtor's motion for summary judgment should be granted.

## FINDINGS OF FACT[2]

1. The debtor, Emons Industries, Inc. ("Emons" or "Debtor"), filed a petition for reorganization under Chapter 11 of the Bankruptcy Code on March 30, 1984 (the "Filing Date") and continued as a debtor in possession. The Debtor was in the business of leasing and repairing railcars and through its subsidiaries operated two short line freight railroads. The filing of the Chapter 11 petition resulted from a lengthy and severe decline in the railcar leasing business in which the Debtor had been engaged for about 13 years. As of June 30, 1984, the Debtor and its subsidiaries had a shareholders' deficit of $6,180,416 on its consolidated balance sheets. *Disclosure Statement,* Exhibit C at 36. The Debtor had concluded that it would have inadequate revenues to service its debt and lease obligations. *Disclosure Statement* at 4. Until the early 1970's, the Debtor, as more fully described below, had also been in the pharmaceutical drug business.

2. The common stock of the Debtor was publicly held. According to the Chapter 11 petition there were about 3,000 holders of the 4,974,233 outstanding shares of the Debtor's voting common stock. The Debtor also had three series of preferred stock—two series of which had only two holders and one series of which had 1,000 holders. *Disclosure Statement* at 4.

3. On the Filing Date, a small number of financial institutions held security interests in substantially all of the Debtor's assets or were the lessors of the railcars and other equipment utilized by the Debtor. The dollar amount of the secured debt exceeded the value of the Debtor's assets. At the time the Chapter 11 petition was filed, each non-tort creditor of the Debtor with more than a de minimis claim was also a secured creditor or a lessor (collectively the "Institutions"). Almost all of the Institutions held substantial unsecured deficiency or potential lease rejection claims because of the deterioration in the market value of railcars. An Official Committee of Creditors was appointed on

---

1. DES is a drug that was marketed in the United States from 1947 until 1971 for use during pregnancy to prevent spontaneous abortion. All findings in this opinion relative to DES are made solely for the purpose of resolving the dispute presented to this court and are not for use in any other litigation.

2. The findings of fact are based on the undisputed facts presented in the motion papers and on documents in the Chapter 11 case. Familiarity with the Court's prior decisions in the Debtor's case is also presumed. See *In re Emons Industries, Inc.,* 50 B.R. 692 (Bankr.S.D.N.Y.1985) and *In re Emons Industries, Inc.,* 76 B.R. 59 (Bankr. S.D.N.Y.1987).

April 17, 1984.[3]  The Creditors' Committee was composed entirely of the Institutions. *Disclosure Statement* at 4–5.

4.  The Debtor was the successor to Grant Chemical Co. ("Grant") and Amfre–Grant, Inc. ("Amfre–Grant").  Grant and Amfre–Grant were among more than 100 companies which sold DES. DES was prescribed to at least 600,000 women.  The DES distributed by Grant and Amfre–Grant was unusual in that it was uniquely identifiable by color and shape.  However, the Debtor was neither a significant factor with respect to the nationwide sale of DES, nor was it a significant factor in the drug industry.  *Disclosure Statement* at 6.

5.  In 1971, an article was published in which the author urged that there was an association between maternal ingestation of DES and clear cell adenocarcinoma of the vagina of young women.  The Federal Drug Administration withdrew its approval of DES in Fall 1971.  Thereafter, and prior to the time the Debtor filed its chapter 11 case in 1984, numerous lawsuits were brought throughout the United States against DES manufacturers and distributors asserting damages arising out of maternal ingestion. Few plaintiffs were in a position to identify which company's DES had caused their injuries.  This led to the development of new theories of liability under which the manufacturers and distributors could be held liable.[4] Among the theories of liability is the marketshare theory on the basis of which all manufacturers and distributors are liable to DES plaintiffs in proportion to their share of the market.  The Debtor has been determined to have a minor market share.

6.  In August 1986, the Debtor sought to have this court fix the last day for filing claims.  The Debtor sought to require that those persons who knew or had reason to know that they were holders of claims for which the Debtor might be liable for compensatory damages allegedly caused, directly or indirectly, by Emons' sale, marketing or distribution of DES file claims against the estate on or before September 30, 1986 or be barred from asserting claims thereafter. The Debtor sought to have the order fixing the last day for filing claims provide that the holders of DES claims would be barred whether known to Emons or not and regardless of whether they received notice of the bar date if they failed to file a claim (the "First Proposed Bar Order").

7.  The Debtor's application presented a significant issue as to whether it complied with the requirements for constitutionally sufficient notice to satisfy due process standards.  Due process requires that creditors receive notice reasonably calculated under the circumstances to apprise them of the proceedings.  *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865 (1950).  It was highly questionable whether due process could be afforded the holders of DES claims unknown to the Debtor without an extensive noticing program.  Even if an extensive noticing program had been undertaken it is uncertain that it would have been adequate since many plaintiffs may not yet have become aware of

---

3.  On June 18, 1984, the Securities and Exchange Commission (the "SEC") made a motion for the appointment of an equity security holders' committee.  Both the Debtor and the Creditors' Committee opposed the motion on the grounds that the Debtor was insolvent and that therefore no equity committee was warranted.  After hearings on the motion commenced, the objections were withdrawn and on August 2, 1984 the court ordered the appointment of an equity holders' committee.  Basically there were two types of shareholders: those which were only shareholders and those which were also secured and/or unsecured creditors.  No doubt part of the reason that the opposition to the appointment of an equity committee was withdrawn was recognition of the potential conflict of shareholders who were also holders of claims.

4.  It is beyond the scope of this opinion to detail the history of the development of liability theories with respect to DES. However, the fact that such litigation was going on and was well-known to all the parties and to this court is an important part of the context in which the Debtor's plan and its confirmation must be viewed.  Early decisions include the decision of the New York Court of Appeals in which it first addressed DES liability.  *See Bichler v. Eli Lilly and Co.*, 55 N.Y.2d 571, 579–580, 450 N.Y.S.2d 776, 436 N.E.2d 182 (1982)("Products liability law cannot be expected to stand still where innocent victims face 'inordinately difficult problems of proof'.") See also *Sindell v. Abbott Laboratories*, 26 Cal.3d 588, 607 P.2d 924, 163 Cal.Rptr. 132 (1980) and *Martin v. Abbott Laboratories*, 102 Wash.2d 581, 689 P.2d 368 (1984).

any injury. Nor would plaintiffs have necessarily identified the Debtor as a possible defendant since market share liability theories were then in their infancy.[5]

8. The Debtor had few assets not subject to security interests. The Debtor's limited financial resources would not have allowed it to conduct a widespread notification program and to review any claims that might be received. The secured creditors were not prepared to pay for an extensive DES notification program. As a result, the Debtor withdrew its request for entry of the First Proposed Bar Order when it became apparent that this court would require a widespread notification program if the Debtor wanted the bar order to include claimants whose identities were unknown to the Debtor.

9. Thereafter and on September 9, 1986, this Court approved a modified bar order ("Modified Bar Order") and notice procedure. The Modified Bar Order provided:

"[It is] FOUND, that notice of the Bar Date (as hereinafter defined) pursuant to this order is reasonably calculated, under all the circumstances present here, to apprise persons which may assert claims against Emons, including those persons (the 'DES Claim Holders') (i) which Emons knows to have asserted claims (the 'DES Claims') for which Emons may be liable, directly or indirectly, for compensatory damages * * * allegedly caused, arising out of or resulting from, directly or indirectly, the sale, marketing or distribution of the drug diethylstilbestrol ('DES') by Emons * * * and (ii) which receive a copy of the Notice (as hereinafter defined) through service of the Notice upon their counsel or service of the Notice upon them individually, *but excluding persons who may hold or assert DES Claims against Emons, directly or indirectly, which are presently unknown to Emons,* of the necessity to file proofs of claim on or before October 10, 1986 and to provide them with ample opportunity to file their proofs of claim against Emons * * *"

[and it is] ORDERED, that pursuant to Rule 3003(c)(3) of the Bankruptcy Rules, all entities, including individuals, partnerships, corporations, estates, trusts and governmental units, including, but not limited to the DES Claim Holders who assert a claim (as defined in § 101(4) of the Bankruptcy Code) against Emons shall file proofs of such claims on or before October 10, 1986, (the "Bar Date") * * *

"[and it is] ORDERED, that all entities who, by this order, are required to file a proof of claim in the form and manner required by this order, but who shall fail to do so on or before the Bar Date, shall not with respect to any claim, be treated as a creditor of Emons for the purposes of voting on the distribution under any play or reorganization of Emons * * *" (emphasis added.)

10. The Modified Bar Order explicitly provided that the claims bar date did not apply to persons with claims based on DES exposure who were unknown to the Debtor. The Modified Bar Order, although unusual in that it applied to less than all of the potential creditors of the Debtor, was commensurate with the Debtor's limited resources, the uncertain prospects for its future and the availability of some insurance covering DES claims.[6]

---

**5.** Prior to the time that the Debtor sought entry of the First Proposed Bar Order, A.H. Robins Co. ("Robins"), the manufacturer of the Dalkon Shield, had filed a Chapter 11 petition. Robins had over 5,000 lawsuits pending against it arising out of use of the Dalkon Shield at the time it filed. In late 1985 and early 1986, Robins sought, and ultimately obtained, approval of a costly notification program with respect to the filing of proofs of claim by Dalkon Shield users that was receiving widespread publicity by the time of the hearing on the Debtor's First Proposed Bar Order. Robins received over 175,000 initial responses to its notification program. *See Vancouver Women's Health Collective Soc. v. A.H.* *Robins Co.,* 820 F.2d 1359 (4th Cir.1987) (Held that program of notification for foreign claimants was reasonable).

**6.** The nature and amount of the Debtor's insurance coverage was a subject of dispute as the Debtor was then engaged in litigation with its insurance carriers to establish coverage which the carriers had denied. The Debtor was not certain that, even if it prevailed in its coverage litigation, the levels of coverage would be sufficient to cover all DES claims. Prior to confirmation, Emons had been able to reach an accommodation with an insurer to pay all defense

11. The Debtor served notice of the Modified Bar Order (the "Bar Notice") on, *inter alia*, all entities which had filed proofs of claim in the case, counsel for each DES Claim Holder, as that term was defined in the Modified Bar Order, as well as on those DES Claim Holders whose addresses were known to the Debtor. The Debtor also published the notice of the Modified Bar Order in The New York Times, The Wall Street Journal, The York Daily Record, The York Dispatch and the DES Litigation Reporter.

12. The published notice stated:

"PLEASE TAKE NOTICE, that the United States Bankruptcy Court for the Southern District of New York (the 'Bankruptcy Court') has entered an order dated September 9, 1986 in accordance with Rule 3003(c)(3) of the Bankruptcy Rules requiring all entities, including individuals, partnerships, corporations, estates, trusts and governmental units (including DES Claim Holders, as hereinafter defined) who assert a claim before October 10, 1986 (the 'Bar Date') * * *"

As used herein "DES Claim Holders" mean those persons, known to Emons and who receive a copy of this notice either directly or through service of this notice upon their counsel who asserted that they hold claims for which Emons may be liable, directly or indirectly, for compensatory damages * * * arising out of or resulting from, directly or indirectly, the sale, marketing or distribution of the drug diethylstilbes-trol (commonly known as "DES"), by Emons * * *.

13. The Debtor did not send the Bar Notice directly to any of the Subsequent DES Claimants.[7]

14. After being in Chapter 11 for more than two years, the Debtor negotiated a plan of reorganization ("Plan") acceptable to the financial institutions who were its major secured and unsecured creditors (other than DES Claimants). The terms of the Plan provided for the Debtor to convert from be-

ing the owner/lessee of railcars to the manager of railcars. A new corporate structure was established with a parent company, Emons Holdings, Inc. ("Holdings"), created and liable to make the distributions required by the Plan.

15. The Plan, which is complex and contains a number of classes due to the number of secured creditors, provided for unsecured creditors, including DES Claim Holders, who are in Class 5A, to receive distributions in the form of a combination of cash and shares of new preferred stock and new common stock of Holdings. It was specifically anticipated that Holdings would pursue new business opportunities. While the Disclosure Statement projected that the future management of railcars would result in a loss by the reorganized Debtor, the five-year projection demonstrated that Holdings would generate positive cash flow. *Disclosure Statement* at 10.

"To the extend that creditors and equity security holders will receive [Holdings] Preferred Stock and [Holdings] Common Stock and continue to hold such shares, the value of the consideration that creditors are receiving for their claims * * * depends on the viability of Emons Holdings after confirmation * * *. Since the only post-consummation payment requirements of Emons Holdings under the Plan are dividends on the [Holdings] Preferred Stock and since such payment requirements are contingent upon positive Net Cash Flow, the feasibility of the Plan is assured."

*Disclosure Statement* at 29.

16. Counsel for known holders of DES claims participated in the Debtor's case. Early in the case and on May 9, 1984, upon motion of the Debtor, this court had modified the automatic stay provided by Bankruptcy Code § 362 with respect to pending DES actions. This court's order allowed DES actions, including cross-claims and third-party claims and appeals, to proceed to final judg-

---

costs in the DES litigation. *See Disclosure Statement* at 6–7.

7. Some of the Subsequent DES Claimants are represented by attorneys who were served with

the Bar Notice. However, the Debtor has not sought to bar those Subsequent DES Claimants merely by virtue of the fortuity that their choice of counsel had received the Bar Notice.

ment. However, the order did not permit enforcement of any judgment without further order of this court. Settlement of a number of DES claims was approved by this court prior to confirmation. Shortly prior to confirmation the Debtor filed two objections to DES claims. In its objections, the Debtor stated that the aggregate amount of all Class 5A claims other than the DES claims was $50 million. DES claims aggregating approximately $790,000,000 had been filed or asserted against the Debtor. The Debtor stated that number was greatly inflated and that its liability for DES claims would probably not exceed $5 million. The Debtor sought to have the DES claims reduced or expunged as expeditiously as possible. The Debtor also acknowledged that this court could not try personal injury tort claims and stated that it intended to make an appropriate application to the United States District Court to obtain relief. Thereafter, the Debtor by motion dated December 8, 1995 did seek relief in the District Court by way of a motion to withdraw reference and direct venue for the liquidation of disputed DES claims.

17. The Court approved the Debtor's First Amended and Restated Disclosure Statement (the "Disclosure Statement") on or about November 10, 1986. The Court confirmed the Debtor's Plan of Reorganization on December 19, 1986.

18. The Plan does not separately classify the DES Claims and by virtue of the Plan definitions they are Class 5A Claims. The Plan provides for Class 5A Claimants to receive *pro rata* distributions from an escrow fund comprised of a Plan-specified amount of cash, preferred stock of Holdings and common stock of Holdings (collectively, the "Property"). The Plan provides for periodic distributions of the Property to holders of allowed Class 5A Claims ("Allowed Claimants") and provides that new Allowed Claimants will receive the same amount of Property *pro rata* as previously Allowed Claimants.

19. If the Debtor had been liquidated rather than reorganized, Class 5A creditors would have received little or no distribution as substantially all of the Debtor's assets were subject to liens or held under leases, and the remaining proceeds of liquidation would have been inadequate to satisfy the expenses of administration, which had priority over unsecured claims.

"Emons believes that liquidation * * * would be disastrous and would provide holders of claims with little or no return * * * Since substantially all of Emons assets and the assets of its affiliates are subject to liens and security interests or held under leases, upon a liquidation creditors and lessors will take possession of the assets or the assets will be sold to satisfy a portion of a secured creditor's claims."

"Emons believes that any portion of the proceeds of a liquidation which would not be paid to secured creditors would be nominal, and would undoubtedly be inadequate to satisfy the expenses of administration of a liquidation proceeding and the unpaid expenses of the chapter 11 proceeding, all of which must be paid in full before anything can be paid to unsecured creditors."

*Disclosure Statement* at 30.

20. The order confirming the Plan (the "Confirmation Order") provides that Emons "shall be discharged, pursuant to § 1141(d)(1) of the Code, from all claims and debts that arose before the Confirmation Date".

21. Since the confirmation of the Plan, six distributions of Property have been made to Class 5A Claimants holding a total of $52,110,705 of allowed claims. Sufficient Property has been held in reserve so that if an additional $73,505,000 in Class 5A claims were allowed, each of such allowed claims would receive as much on a *pro rata* basis as the holders of previously allowed claims have already received.

22. Each of the Subsequent DES Claimants has brought an action against the Debtor, among others, asserting that the Debtor is liable in money damages for injuries alleged to be caused by reason of exposure to DES. None of the Subsequent DES Claimants commenced a DES Action in which the Debtor was included as a defendant prior to May 1987, which was after the Confirmation Date. None of the Subsequent DES Claimants had notified the Debtor that they sought damages from the Debtor for injuries alleg-

edly incurred as a result of exposure to DES prior to the Confirmation Date. None of the Subsequent DES Claimants filed a proof of claim in the Chapter 11 case prior to the Confirmation Date.

23. The Debtor has been held liable to persons who never took its product based on the Debtor's share of the total DES market based on the market share theory of liability in New York and elsewhere. Virtually all of the Subsequent DES Claimants are market share claimants who are unable to show which company manufactured the product taken. The Subsequent DES Claimants still have the right to pursue other manufacturers, few of whom are in bankruptcy, and many DES claimants are doing so.

24. A total of 737 DES Actions have been brought against the Debtor. Of the 737 DES Actions brought against the Debtor, 550 have been settled or otherwise disposed of for a gross value of $3,535,348. Of the Subsequent DES Actions, 235 have been settled as Class 5A claims for the total claim amount of $2,949,798.

25. This adversary proceeding was commenced in August 1989. In the first claim for relief, the complaint seeks a judgment declaring that the Subsequent DES Claimants are holders of Class 5A claims against the Debtor, entitled to receive distributions of Property pursuant to the Plan based upon the allowed amount, if any, of the claim, and that, except as provided in the Plan, the Subsequent DES Claimants are not entitled to any other or further recovery against the Debtor. The second claim for relief relates to the so-called "Revival Claimants". On July 30, 1986, Section 4 of Chapter 682 of the Consolidated Laws of New York (the "Revival Statute") became effective. Pursuant to the Revival Statute, persons with claims for damages for personal injury, property damage or death allegedly caused by DES (among other substances) that were time barred or had been dismissed under the applicable New York statutes of limitations as of July 30, 1986 were permitted to institute

actions therefor until July 30, 1987. Therefore, from the Filing Date through July 30, 1986, if any Revival Claimant had filed a proof of claim, the claim would have been unallowable against the Debtor pursuant to Code § 502(b)(1) because it was then barred by the applicable statutes of limitation. However, by confirmation, which as indicated earlier occurred in December 1986, the revival period had come into effect and was still open. The second claim seeks the same declaration of rights sought in the first claim but is directed solely at the Revival Claimants. For the purposes of this decision both groups are referred to as the Subsequent DES Claimants as there is no relevant distinction in their rights on the issues presently before this court.

26. The complaint has subsequently been amended several times to include additional defendants. Answers have been filed on behalf of all, or virtually all, defendants.

27. On June 5, 1990, the Debtor made its original Motion for Summary Judgment (Document 83A). On December 4, 1990, Stephen Sheller, Esq. of the law firm of Sheller, Ludwig & Badely and Sybil Shainwald, Esq. of the law offices of Sybil Shainwald filed a Joint Affirmation in Opposition to the Debtor's Motion for Summary Judgment (Document 100A). Mr. Sheller and Ms. Shainwald represent more than 125 of the Subsequent DES Claimants who are defendants in this action.

28. Subsequently, the Debtor renewed its Motion for Summary Judgment together with its Statement of Material Facts pursuant to Local Bankruptcy Rule 13(h) [8] and its Memorandum of Law in Support of its Motion for Summary Judgment (Document 145A). The defendants represented by Mr. Sheller and Ms. Shainwald filed a new Opposition to the Motion for Summary Judgment (Document 155A). The Debtor filed its Reply to the defendants' Opposition (Document 150A). A hearing on the Motion for Summary Judgment was held.[9] At the conclusion of

---

8. Now known as Local Bankruptcy Rule 7056–1.

9. Subsequent to the hearing, Audrey M. Perlman, Esq., of Levy Phillips & Konigsberg, representing various defendants, filed an Affirmation in Opposition to the Motion for Summary Judgment (Document 165A) adopting Sheller and Shainwald's joint opposition and the defendants represented by Mr. Sheller and Ms. Shainwald filed

the hearing on the motion, this court advised the parties of its view that the Subsequent Claimants were only entitled to the distribution available to Class 5A claims under the Plan as the Modified Bar Notice did not fix any time for the filing of their claims. Thus, the Subsequent DES Claimants did not have "late" claims. The matter was taken under advisement. A number of defendants have since settled with the Debtor based on treatment as Allowed Claimants with Class 5A claims.

## DISCUSSION

■ Although there has been strong opposition to the Debtor's motion for summary judgment, the matter can be decided by way of summary judgment since there are no material issues of fact in dispute. There remain material disputed facts between the Debtor and the Subsequent DES Claimants relative to the merits of the DES claims themselves. However, none of those disputes are material to the proper treatment of the Subsequent DES claims in this case as the amounts of those claims must be fixed in another forum. See 28 U.S.C. § 157(b)(2)(B). Summary judgment is appropriate when there is no triable issue of material fact and the movant is entitled to judgment as matter of substantive law. *Hamilton v. Smith,* 773 F.2d 461 (2d Cir. 1985). *See also Katz v. Goodyear Tire & Rubber Co.,* 737 F.2d 238, 244 (2d Cir.1984).

This motion for summary judgment raises now familiar issues in somewhat novel packaging. At the time of confirmation of the Debtor's Plan in 1986, there was little guidance in the case law and no generally accepted standards for handling the problems presented in this case. Subsequently, the Second Circuit has approved the principles that underlie the Debtor's confirmed Plan in other cases with large numbers of claims alleging damages for personal injuries based on exposure to one or more of a debtor's products. See, e.g., *MacArthur Co. v. Johns–Manville Corp.,* 837 F.2d 89 (2d Cir.1988)("*MacArthur*") and *In re Chateaugay Corp.,* 944 F.2d 997 (2d Cir.1991)("*Chateaugay*").

their Statement of Material Facts pursuant to

In *MacArthur* the Second Circuit approved an order of the bankruptcy court which enjoined lawsuits by third parties against the debtor's insurance carriers and "channelled" those claims to the fund created by the debtors' settlement with the carriers.

"The Bankruptcy Court properly issued the order pursuant to its equitable and statutory powers to dispose of the debtor's property free and clear of third-party interests and to channel those interests to the proceeds thereby created." 837 F.2d at 91.

The Second Circuit noted that numerous courts had previously determined that the debtor's insurance policies are property of the estate subject to the bankruptcy court's jurisdiction. *Id.* at 92.

The Second Circuit went on to find the authority for the channeling orders in Bankruptcy Code § 363(f) which authorizes the sale of property in the debtor's estate free and clear of any interest in the property of an entity other than the estate. Among the circumstances that authorize such a sale is that the third-party interest be in *bona fide* dispute. The bankruptcy court had found that such a dispute existed because the debtor believed its product liability policy limits had been exhausted. In upholding the action of the bankruptcy court, the Second Circuit stated:

"The authority to issue the injunction is thus a corollary to the power to dispose of assets free and clear and to channel claims to the proceeds." 837 F.2d at 93.

*Id.* at 93. While acknowledging that their analysis was not precisely the same as in the traditional sale of real estate free and clear of liens followed by a channeling of the liens to the proceeds of the sale, the Second Circuit was nevertheless clear that the third party was adequately protected in a sale free and clear if the third party's interest was assertable against the proceeds of the disposition. *Id.* at 94.

Functionally there were only three choices for treatment of the Subsequent DES Claimants in this case once the Debtor filed its

Local Bankruptcy Rule 13(h)(Document 166A).

Chapter 11 petition: (1) the Subsequent DES Claimants could be considered to have pre-petition claims to be dealt with under a plan of reorganization; (2) they could have claims entitled to administrative priority under Code § 503(a); or (3) they could have claims that "rode through" the Chapter 11 case and confirmation of a plan of reorganization unaffected to be assertable in full against the reorganized entity. The Debtor provides for the Subsequent DES Claimants to be dealt with under the Plan. Either of the other choices would have resulted in no plan being confirmed and the liquidation of the Debtor and dispersal of its assets to the secured creditors and lessors. The Debtor would have rapidly become administratively insolvent under the second choice because virtually all of its assets were secured or subject to lease. Under the third choice, the secured creditors and lessors would not have voted for the Debtor's Plan as it would have imposed so large a liability on the Reorganized Debtor as to make liquidation a preferable alternative. Had the Debtor's case resulted in a liquidation of its assets, the Subsequent DES Claimants would have received nothing except a participation in any available insurance recoveries.[10]

The Debtor's Plan functionally created a pool from which Class 5A Claims could be paid as they were asserted and liquidated.

Confirmation "channelled" payment on the Subsequent DES claims to a fund established for Class 5A claims. No future representative was appointed to represent DES claimants who had not yet manifested any injury. Compare *In re Johns–Manville Corp.*, 36 B.R. 743 (Bankr.S.D.N.Y.1984). However, the attorneys representing known DES claimants participated in the Debtor's case. The known DES Claimants voted for the Plan in sufficient numbers to allow confirmation. The mechanisms established in the Plan have worked without difficulty for many years and there appears to be little likelihood that allowed DES Claims will outstrip resources.[11]

This court finds nothing surprising in the treatment of the Subsequent DES Claimants as pre-petition creditors in the Debtor's Plan notwithstanding that their claims may have first accrued for statute of limitation purposes after the Debtor's Chapter 11 petition was filed or the Plan was confirmed. All of the acts of the Debtor which gave rise to its liability were done long prior to the Filing Date. DES had not been used, sold, manufactured or distributed for over 10 years by the Filing Date.

*The Absence of a Bar Date as to Subsequent DES Claimants*

Although the treatment of Subsequent DES Claims under the Debtor's Plan can be

---

**10.** That certainly would have been the result under the former Bankruptcy Act of 1898 (the "Act"). Under former Chapter XI, a confirmed plan was binding upon all creditors of the debtor "whether or not they are affected by the arrangement or have accepted it or have filed their claims, and whether or not their claims have been scheduled or allowed and are allowable". Act § 367(1). The term "creditors" was defined in Act § 307(1) of Chapter XI to include "the holders of all unsecured debts, demands, or claims of whatever character against a debtor, whether or not provable as debts under section 63 of this Act and whether liquidated or unliquidated, fixed or contingent". However, Act § 63a(7) provided that a claim based on a right to recover damages in an action for negligence could be proved and allowed *only if* an action for negligence was instituted prior to and pending at the time of the filing of the petition in bankruptcy. Historically the treatment of negligence claims in bankruptcy cases has been unfavorable to the claimant. It was not until the United States Supreme Court issued its 1968 landmark ruling in *Reading Co. v. Brown*, 391 U.S. 471, 88

S.Ct. 1759, 20 L.Ed.2d 751 (1968), that the holder of a negligence claim against a receiver appointed during a Chapter XI case was found to have a claim entitled to expense of administration status.

**11.** The nature of the DES claims is somewhat different than the type of personal injury claims found in the asbestos cases or *A.H. Robins*. DES does not appear to have harmed the mother who took it. Rather it affected her children. Although initially the damage was thought to be limited to daughters, it now appears to have affected sons as well. More recently some so-called third generation suits have been filed alleging birth injuries to children of DES daughters due to problems created by malformed reproductive organs. These later claims face significant barriers such as statute of limitations defenses and forseeability. The New York Court of Appeals has held that liability does not extend to third generation claims. *See Enright v. Eli Lilly & Co.*, 77 N.Y.2d 377, 568 N.Y.S.2d 550, 570 N.E.2d 198 (1991).

justified by reliance on the Second Circuit's rulings, it is also appropriate to consider the propriety of the bar date mechanism used in the Debtor's case. In this case, the court has never fixed a time when the Subsequent DES Claimants were required to file a proof of claim. The Subsequent DES Claimants urge that because they were never notified of the bar date, they may pursue the Reorganized Debtor and seek to recover 100% of their claims. The Debtor's response is that however valid that proposition may be generally it is inapplicable in this case because no bar date was fixed for the filing of Subsequent DES Claims and such claims can still be filed and will be timely.

Bankruptcy Rule 3003(c)(3) provides that

"The court shall fix and for cause shown may extend the time within which proofs of claim * * * may be filed."

While Bankruptcy Rule 3003(c)(3) may appear to mandate that the court fix a bar date as to *all* claims in a Chapter 11 case, it is an undisputable fact that the court in this case knowingly did not do so because a widespread noticing program was prohibitively expensive.

Bankruptcy Rule 3003(c)(2) provides that any creditor whose claim is not scheduled or scheduled as disputed, contingent, or unliquidated must file a claim within the time fixed by the court. It further provides that any creditor who fails to do so shall not be treated as a creditor with respect to such claim for the purposes of voting and distribution. The result in this court's view is that this final portion of Bankruptcy Rule 3003(c)(2) which states the consequences of a failure to file a claim has never become operative as to the Subsequent DES Claims because no bar date was fixed for those claims.

It is only logical in this court's view that a creditor as to whom no bar date has been set has the right to file a timely claim post-confirmation.[12] Once a timely filed claim is allowed, the holder becomes entitled to the distribution provided for under the Debtor's Plan.

This court has found no case which expressly discusses whether in pursuing its claim against the reorganized debtor a creditor who failed to receive notice of the bar date is entitled to receive (a) the distribution it would have received under the debtor's confirmed plan or (b) a 100 cents on the dollar. When a creditor does not receive the requisite notice of the bar date and its claim is not barred, the appropriate remedy should be to put the creditor in the same position it would have been had notice been properly served by allowing the creditor to file a late claim against the estate. *See City of New York v. New York, N.H. & H.R. Co.*, 344 U.S. 293, 297, 73 S.Ct. 299, 301, 97 L.Ed. 333 (1953); *In re Intaco Puerto Rico, Inc.*, 494 F.2d 94 (1st Cir.1974); *In re Harbor Tank Storage Co.*, 385 F.2d 111 (3d Cir.1967); *In re Pettibone Corp.*, (*Pettibone Corp. v. Payne*) 151 B.R. 166 (Bankr.N.D.Ill.1993); *In re Charter Co.*, 68 B.R. 396 (Bankr. M.D.Fla.1986), *appeal dismissed*, 76 B.R. 191 (M.D.Fla.1987); *In re May's Family Centers, Inc.*, 54 B.R. 256 (Bankr.N.D.Ill.1985). On that claim they are entitled to receive the distribution provided for in the confirmed plan.

There are no equities in favor of the creditor receiving more than it would have received if it had filed a timely claim since the dividend it should have received is all it lost. However, in the event that a single creditor is involved, the prospect that the omitted creditor might be able to recover 100 cents on the dollar rather than the plan distribution may be regarded by some courts as an appropriate "penalty" to ensure that debtors are properly motivated to list all creditors. In other cases the difference might have little economic impact on the debtor. In some cases, the debtor has sought to put the claimant between a rock and hard place urging both that the claim was discharged by virtue of the confirmation order and also that the claimant was barred from filing a claim by virtue of missing the bar date even though it did not receive actual notice of it.

---

12. Although the Debtor sometimes refers to the putative claims of the Subsequent DES Claimants as late claims, that is erroneous. No claim can be late if there never was a time by which it was required to be filed.

Here, the Debtor proposes no such unpleasant choice. Rather, the Debtor urges that, although the Subsequent DES Claims are discharged by virtue of the confirmation order, meaning that they cannot be asserted against the Reorganized Debtor, the Subsequent DES Claimants are entitled to receive distributions as Class 5A Claimants as their claims are allowed. The Debtor has treated the Subsequent DES Claimants *pari passu* with the treatment it has accorded the original DES Claimants, who were required to file claims by the bar date. The Subsequent DES Claimants are not satisfied with this equality of treatment and want instead to be able to avoid the effects of the Debtor's insolvency and recover 100 cents on the dollar.[13] This court sees no equities in favor of the Subsequent DES Claimants that would warrant ignoring the effect of the confirmation of the Plan and the scope of the confirmation injunction. Nor does it see any equities in favor of Subsequent DES Claimants recovering *more* than DES Claimants who were required to file claims by the bar date. The Reorganized Debtor is entitled to continue its business in reliance on the confirmation order and injunction.

*The Subsequent DES Claimants as the Holders of Claims*

The Subsequent DES Claimants also urge that they ought to be allowed to pursue their claims in full against the Reorganized Debtor because they assert that their claims arose after confirmation. The major argument made by the Subsequent DES Claimants is that they are not holders of Claims. They urge that the definition of claim found in Bankruptcy Code § 101(9) does not include future tort claims of the type they assert. In making this argument the Subsequent DES Claimants rely heavily on the now much discredited decision of the Third Circuit in *In re M. Frenville Co.*, 744 F.2d 332 (3rd Cir.1984).

The Code defines a "Creditor" as an "entity that has a claim against the debtor that arose at the time or before the order for the relief concerning the debtor." See Code § 101(9). The Code defines a "Claim" as:

"(A) right to a payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured ..." See Code § 101(4).

The legislative history of these sections indicates that Congress sought the "broadest possible definition" of a claim. *United States v. LTV*, 944 F.2d 997, 1003 (2d Cir.1991); *In re Robinson*, 776 F.2d 30, 34 (2d Cir.1985). A broad definition of "claim" furthers the bankruptcy goal of a fresh start for the debtor and also fosters equality of treatment for all similarly situated creditors.

"Consistent with the goals of uniform treatment for creditors and a fresh start for debtors, courts have determined when a claim arises for Code purposes by focusing upon 'the time when the acts giving rise to the alleged liability were performed,' since only reference to pre-petition acts of the debtor will result in treating liabilities flowing from such acts in equitable fashion."

*In re Chateaugay Corp.*, 87 B.R. 779, 796 (S.D.N.Y.1988); (quoting *In re Johns–Manville Corp.*, 57 B.R. 680, 690 (Bankr.S.D.N.Y. 1986)); *accord, In re Ionosphere Clubs, Inc.*, 101 B.R. 844, 849 (Bankr.S.D.N.Y.1989). Tort victims injured by the debtor's prepetition conduct are "creditors" who have pre-petition claims. *Grady v. A.H. Robins Co., Inc.*, 839 F.2d 198 (4th Cir.1988); *In re Johns–Manville Corp.*, 57 B.R. at 690. "The proper focus [is] on the time when the acts giving rise to the alleged liability were performed ... for federal bankruptcy purposes, a pre-petition 'claim' may well encompass a cause of action that, under state law, was not cognizable until after the bankruptcy petition was filed." *In re Johns–Manville Corp.*, 57 B.R. at 690; *accord, Waterman Steamship Corp. v. Aguiar, (In re Waterman Steamship Corp.)*, 141 B.R. 552 (Bankr.S.D.N.Y.1992).

---

13. The Subsequent DES Claimants believe that if they were allowed to proceed they would recover in full any judgments received. That would depend on whether there are assets on which an execution could be levied. The terms of the confirmed Plan provided for a complex corporate restructuring and it is entirely possible that the Subsequent DES Claimants would not be able successfully to levy execution on any judgment so as to get payment in full.

194

"If a tort claimant is exposed to a defective product and sustains a bodily injury or impact that gives rise to future injury prior to the commencement of the debtor's case, the claimant's bankruptcy claim arises prepetition. This rule applies regardless of non-bankruptcy law providing that the cause of action on the claim does not arise until the claimant discovers his injury or the cause of his injury. Accordingly, in case of pre-petition exposure to harmful chemicals, drugs, materials or intrauterine devices, the bankruptcy courts will presume that a bodily injury was sustained at the time of the exposure to the defective product. For bankruptcy purposes, the claim will be deemed to arise at that time, regardless of whether the injury remains latent and does not manifest itself until after a case is commenced. '[I]t is the injury and not its discovery that title manufacturer liable in the underlay suit ...' In such cases, the bankruptcy claim exists before a nonbankruptcy cause of action accrues."

*In re Pettibone Corp.,* 90 B.R. 918, 931–32 (Bankr.N.D.Ill.1988), (emphasis supplied; citations omitted); *Accord, In re Edge,* 60 B.R. 690 (Bankr.M.D.Tenn.1986).

■ The Subsequent DES Claimants' claims relate to the marketing by the Debtor of DES many years prior to the Filing Date. All of the Subsequent DES Claimants' *in utero* exposure to DES necessarily occurred long prior to the Filing Date since DES was last marketed in 1971. This court is of the view that the Subsequent DES claims are pre-Filing Date claims.

*The Validity of the Confirmation Order*

No direct appeal was ever taken from the Confirmation Order and that Order has long since become final. In seeking payment in full on their claims, the Subsequent DES Claimants are seeking to challenge, *albeit* indirectly, the discharge and injunctive provisions of the Order of Confirmation which is the law of this case. The Subsequent DES Claimants are essentially making a collateral attack on the order confirming the Debtor's Plan. Because that Order became final so long ago, parties have changed their posi-

tions in reliance on it. No remedy could be fashioned to "unscramble the eggs." Nor is it necessary to do so since the Debtor's confirmed Plan provides for *pari passu* treatment of Subsequent DES Claimants with DES Claimants who filed claims by the bar date.

No two Chapter 11 cases are identical. This case had its unique features. The assets were virtually all fully encumbered with liens or were leased. The product liability claims related to a product whose distribution had long since been discontinued. The Debtor was involved in a totally different line of business. Many DES claims were barred by state statutes of limitations at the time the Debtor filed its case. Indeed, the New York statute of limitations barred the claims at the time the Debtor filed its petition in 1984 until it was amended in mid–1986 to give a one-year window of opportunity to file DES claims.

Holding that the Subsequent DES Claimants are Class 5A Creditors entitled to distribution only pursuant to the Debtor's Plan results in the uniform treatment of creditors of the Debtor who assert identical claims. It avoids the inequitable result of treating them disparately merely because of the fortuity of when they commenced their civil tort actions. No *inter sese* fairness among all DES Claimants would be achieved by holding as the Defendants seek. Rather they would potentially achieve recoveries greatly in excess of those recovered by DES Claimants who know of and participated in the Debtor's case.

The Debtor is entitled to summary judgment declaring that the Subsequent DES Claimants are holders of Class 5A Claims against the Debtor's estate, entitled only to distributions of property from the estate as set forth in the Plan to the extent, if any, their claims are allowed, and to no other or further recovery against the Debtor.

The prevailing party is directed to settle an appropriate judgment.