**Elizabeth PITTMAN, a minor under 18 years of age by Frederick PITTMAN her father and legal custodian and Frederick Pittman, individually, Plaintiffs–Appellants,**

v.

**Erna (Etta) Pittman GRAYSON, a/k/a Erna Eyjolfsdottir, Helgi Hilmarsson, and Gudmundur Karl Jonsson, Defendants,**

Icelandair, Inc., Defendant–Appellee.

Docket No. 97–9066.

United States Court of Appeals,
Second Circuit.

Argued Jan. 6, 1998.

Decided June 26, 1998.

Howard A. Wintner, New York City, (Robert K. Erlanger, New York City, on the brief), for Plaintiffs–Appellants.

John F. Schutty III, New York City (Desmond T. Barry, Jr., Susan S. Kang, Condon & Forsyth, New York City, on the brief), for Defendant–Appellee.

Before: KEARSE and JACOBS, Circuit Judges, and MISHLER, District Judge *.

KEARSE, Circuit Judge:

Plaintiffs Elizabeth Pittman ("Elizabeth"), by her father and legal custodian Frederick Pittman ("Frederick"), and Frederick individually appeal from a judgment entered in the United States District Court for the Southern District of New York, John S. Martin, Jr., *Judge*, setting aside a $15 million jury verdict in their favor against defendant Icelandair, Inc. ("Icelandair"), for its participation in the removal of Elizabeth from the United States by defendant Erna Pittman Grayson a/k/a Erna Eyjolfsdottir ("Erna"), who is Elizabeth's mother and Frederick's ex-wife, in violation of a court order and of Frederick's right to joint custody. The district court granted judgment as a matter of law in favor of Icelandair on the ground that the trial evidence was inadequate to permit a reasonable inference that Icelandair had sufficient notice to allow it to be held liable as a coconspirator or an aider and abettor. On appeal, plaintiffs seek reinstatement of the jury verdict; they also contend that, even if the evidence they introduced was insufficient, judgment against them as a matter of law was improper because of erroneous trial rulings against them. Icelandair contends that judgment in its favor as a matter of law was appropriate, and, alternatively, that it is entitled to a new trial because of errors in the district court's instructions to the jury. For the reasons that follow, we affirm.

## I. BACKGROUND

The facts stipulated by the parties and the evidence at trial, taken in the light most favorable to plaintiffs as the parties against whom judgment as a matter of law was granted, revealed the following.

### A. *The State Court Orders Regarding Elizabeth*

Erna, a citizen of Iceland, and Frederick were married for five years. Following their divorce in 1986, they had joint legal custody of their then-four-year-old daughter, Elizabeth. Elizabeth lived with Erna, but Frederick saw her frequently. Erna then married Brian Grayson ("Grayson"), with whom she had a daughter, Anna Nicole Grayson ("Anna"), born in 1987. Erna, Grayson, Anna, and Elizabeth lived together in northwest Florida. In 1991, Grayson sought a divorce from Erna and requested sole custody of Anna. At about the same time, Frederick brought a proceeding in Okaloosa County, Florida, seeking sole custody of Elizabeth.

In Frederick's custody proceeding, the Okaloosa court on October 28, 1991, issued a temporary injunction prohibiting Erna from removing Elizabeth from the territory encompassed by the First Judicial Circuit of Florida. On May 4, 1992, Frederick was awarded sole custody of Elizabeth.

In the meantime, Grayson had obtained a court order, similarly prohibiting Erna from removing Anna from northwest Florida. In addition, fearing that Erna might flee to Iceland before the custody proceedings were

---

* Honorable Jacob Mishler, of the United States District Court for the Eastern District of New York, sitting by designation.

resolved, Grayson arranged to have the passports of Erna, Anna, and Elizabeth impounded by the court.

B. *Erna's May 1, 1992 Removal of Elizabeth from the United States*

During the pendency of the custody proceedings, notwithstanding the orders not to remove her daughters from northwest Florida, Erna made preparations to take the girls to Iceland. In March 1992, she obtained provisional passports at the Icelandic Consulate in Tallahassee, Florida, to replace those impounded by the court. The Icelandic provisional passports were issued in the names "Erna Eyjolfsdottir," "Elizabeth Jeanne Pittman," and "Anna Nicole Grayson."

In early April, Erna's then-boyfriend, defendant Helgi Hilmarsson, made an airline reservation for himself, through an Icelandair sales agent in New York, to fly on May 2, 1992, from Florida to John F. Kennedy Airport ("JFK Airport") in New York, and from there on Icelandair Flight 614 to Keflavik Airport in Iceland. On April 10, reservations for the same flights were made through an Icelandair sales agent in Iceland for three additional passengers, under the names Ms. S. Hilmarsson, Child "A" Hilmarsson, and Child "B" Hilmarsson. The Icelandair tickets corresponding to these three reservations were paid for in Iceland on April 18 by credit card registered to defendant Gudmundur Karl Jonsson, Erna's stepfather.

During the weekend of April 17–19, Grayson became aware that Erna, Anna, and Elizabeth had disappeared. Suspecting that Erna would attempt to return to Iceland with the girls, Grayson alerted Frederick and undertook to prevent Erna from leaving the country. On Monday April 20, Grayson telephoned the Baltimore–Washington and Orlando, Florida offices of Icelandair. He spoke with Icelandair representatives (whom he could not identify by name or title at trial), told them of his fear that Erna would attempt to leave the country, and told them there was a court order prohibiting Erna from taking the girls out of northwest Florida. Grayson asked whether Icelandair had reservations under the names "Erna Eyjolfsdottir or Pittman or Grayson or Etta or Ron Matlack, Elizabeth Jeanne[ ]Pittman or Anna Nicole Grayson," and was told that Icelandair did not have a reservation under any of those names. (Trial Transcript ("Tr.") 44.) In an effort to enlist the airline's aid in stopping Erna from leaving the country, Grayson gave the employees with whom he spoke physical descriptions of Erna, Anna, and Elizabeth, and said that Erna and the girls would probably be traveling under false names. Grayson testified that this was the substance of his conversation with both the Baltimore–Washington and Orlando offices of Icelandair.

On April 24, four days after Grayson's calls to Icelandair, the "Hilmarsson" May 2 reservations were altered in several respects. The passengers' names were changed from "Hilmarsson" to "Karlsson"; the flights between Florida and New York were cancelled; and the departure date from JFK Airport to Keflavik was advanced to May 1. On May 1, Erna, Hilmarsson, Anna, and Elizabeth arrived at JFK Airport, checked in under the name "Karlsson", and flew to Iceland on Flight 614. Elizabeth, who was then 10 years old, has remained in Iceland; Frederick has not seen his daughter since.

In 1993, Frederick, on behalf of himself and as the legal representative of Elizabeth, commenced the present action in New York state court against Erna, Icelandair, Hilmarsson, and Jonsson, alleging that they had conspired to remove Elizabeth from the United States in violation of Frederick's custody rights. Icelandair removed the action to federal court on the basis of diversity jurisdiction. The individual defendants failed to answer or otherwise appear, and plaintiffs proceeded against Icelandair, asserting claims of intentional interference with parental custody, intentional infliction of emotional distress, false imprisonment, and negligence.

C. *Irregularities in Icelandair's Transport of Erna and the Girls*

In addition to evidence of the above events, plaintiffs presented evidence of airline irregularities in Erna's check-in and departure on the May 1st Flight 614. First, although the names on the reservations had been changed to "Karlsson" on April 24, the tickets were

nontransferable, and new tickets were not issued in the name "Karlsson"; the names on the tickets remained "Hilmarsson." Thus, Erna and the girls were allowed to check in for and depart on Flight 614 despite the fact that there were no reservations in the names shown on their tickets. Further, the provisional passports then possessed by Erna and the girls showed their true names, "Erna Eyjolfsdottir," "Elizabeth Jeanne Pittman," and "Anna Nicole Grayson." Notwithstanding a provision in Icelandair's·customer service manual instructing employees checking in passengers to "compare name in passport to name on ticket," Erna and the girls were allowed to travel on Flight 614 despite the fact that the names on their passports matched neither the "Hilmarsson" names on their tickets nor the "Karlsson" names on their reservations.

Further, the Icelandair passenger manifest for the May 1st Flight 614 was falsified to conceal the presence of Erna and her daughters. Icelandair assigns a "weight and balance" code to each passenger as part of its check-in process. Those codes—"M" for male, "F" for female, "C" for child—represent different average passenger weights and are important for weighting and balancing the aircraft. Olav Ellerup, Icelandair's senior passenger supervisor at JFK Airport, testified that if one were searching for a woman traveling alone with two children, examination of the weight-and-balance column on the passenger manifest would be the quickest way to locate such a group. On the manifest for the May 1st Flight 614, however, though Helgi Hilmarsson (traveling as a "Karlsson") was properly coded "M," the three female "Karlsson" passengers were not coded "F, C, C," which would have signified a woman traveling with two children, but rather were coded as "M, F, C," indicating a man and a woman traveling with one child.

Ellerup was the employee whose initials appeared on the Flight 614 passenger manifest next to the entries for the "Karlsson" passengers, indicating that he checked them in, in disregard of the discrepancies among the names on the reservations, tickets, and passports, and made the false designations of gender and adulthood on the manifest. Ellerup testified at trial that checking in passengers was not a normal part of his duties and that he had not checked in any passengers on May 1. He surmised that he had forgotten to log off the airline's computer system and that someone else had checked in passengers under his initials. Icelandair had admitted, however, that Ellerup "ha[d] checked-in thousands of passengers as a check-in supervisor." (Icelandair Trial Memorandum at 6.) Further, it had stipulated that "Ellerup was responsible for ensuring that the 'Karlssons' held reservations and passenger tickets for Icelandair Flight 614 on May 1, 1992," and that on that day they "were checked-in for Flight 614 at JFK by ... Ellerup." (*Id.* at 5).

Plaintiffs also presented evidence that Jonsson, Erna's stepfather who paid for the tickets for Erna and the girls, was chief of the ·duty-free store at Keflavik Airport and was known to Icelandair executives, including its vice president for operations in the Americas. Further, according to a witness who was a passenger on an Icelandair flight with Erna and Elizabeth in 1993, the year after Elizabeth's removal· to Iceland, Icelandair gave Erna and Elizabeth highly preferential treatment, "practically fawn[ing] over" them, which a flight attendant told the witness was because the Icelandair employees knew Jonsson, Elizabeth's grandfather.

### D. *The Jury's Verdict; Judgment as a Matter of Law*

When plaintiffs had completed presentation of their case but for the testimony of one expert witness, Icelandair moved for judgment as a matter of law pursuant to Rule 50(a) of the Federal Rules of Civil Procedure on the ground that there was insufficient evidence that Icelandair had received notice of the court-ordered restrictions on Erna's travel with Elizabeth:

> The issue that is in dispute. ... is whether Icelandair was on notice of the fact that Mrs. Pittman was not allowed to leave the United States with her daughter.
>
> And there has been no evidence presented, other than Mr. Grayson's statement that he made a telephone call to Icelandair in April of 1992, advising that there were

some restrictions on his ex-wife's travel plans.

. . . .

... I submit that that issue should not even go to the jury because there is no evidence to establish that my client was on notice of any travel restriction with respect to the ex-Mrs. Pittman that they should have acted upon.

(Tr. 266–67.) The court reserved decision, stating that there was "a substantial question here as to whether or not there was sufficient notice." (Tr. 267.) Icelandair attempted to renew its motion at the close of all evidence, stating that it wished to reassert the points made in its trial memorandum, but the court cut off argument, saying that it would submit the case to the jury and hear argument on the motion while the jury was deliberating. (See Part II.A.1. below.)

In submitting the case to the jury, the district court effectively dismissed plaintiffs' negligence claim by refusing to give the jury an instruction on that cause of action. The court submitted the remaining claims of intentional interference with parental custody, intentional infliction of emotional distress, and false imprisonment to the jury; but believing that establishment of Icelandair's liability for its role in Erna's removal of Elizabeth from the United States required proof of the same core facts regardless of the legal theory, the court gave a single set of instructions with respect to liability:

> The question that you must decide is whether the plaintiff has proved by a preponderance of the evidence that the defendant Icelandair wrongfully aided Erna in transporting Elizabeth to Iceland.
>
> In order to find the defendant Icelandair liable for the damage suffered by Mr. Pittman and Elizabeth you must find that Icelandair knew that Erna Pittman had no right to take Elizabeth to Iceland and that by some wrongful act of its own aided or assisted her in removing the child from the United States.

(Tr. 349–50.)

The court gave the jury a verdict form containing the single liability question, "Do you find that plaintiffs have established their claims against defendant Icelandair?" (Tr. 359.) The jury answered this question in the affirmative and awarded plaintiffs a total of $15 million. It awarded Frederick $7.5 million in compensatory damages plus $2.5 million in punitive damages and awarded Elizabeth $2.5 million in compensatory damages plus $2.5 million in punitive damages.

After the verdict was returned, Icelandair again moved for judgment as a matter of law, renewing its contention that there was insufficient evidence to support plaintiffs' claims. In addition, Icelandair argued that the claims for interference with custodial rights should be dismissed as a matter of law (a) because that cause of action had not been recognized as viable under New York law, (b) because on May 1, 1992, Erna had joint custody of Elizabeth, and (c) because even if such a claim were cognizable, Elizabeth had no standing to assert it. Icelandair moved alternatively for a new trial, contending that the trial court had made errors in evidentiary rulings and in instructing the jury.

In a Memorandum Opinion and Order dated July 2, 1997 ("Opinion"), the district court granted Icelandair's motion for judgment as a matter of law. The court found that while there was sufficient evidence to establish that Icelandair, through its agent Ellerup, had knowingly assisted Erna in her attempt to leave the country surreptitiously, the evidence was not sufficient to establish that Ellerup was aware that Erna's conduct violated Frederick's custody rights or a court order restricting her travel with Elizabeth. The court considered and rejected plaintiffs' argument that Grayson's telephone calls to Icelandair and the suspicious nature of Ellerup's own activities sufficed:

> The fact that Grayson had telephone conversations ten days earlier with Icelandair employees in Orlando and Baltimore in which he told them of the existence of a court order is not sufficient to establish that Ellerup was aware that Erna Pittman did not have the right to take her children to Iceland when he assisted them in the boarding process. There is no evidence that either of the two individuals with whom Grayson spoke passed on to Ellerup

any of Grayson's statements and no reason in logic to assume that they did.

While it was obvious to Ellerup that Erna Pittman wished to avoid detection by someone when she was leaving the United States, that fact does not provide a basis for concluding that he knew she was acting in derogation of her ex-husbands' custody rights.

Erna Pittman's use of an assumed name in her travel plans is as consistent with the actions of a woman fleeing from an abusive and dangerous ex-husband as it is with an effort to deprive her ex-husband of his lawful custody rights. The desire for secrecy would be the same in both instances and, therefore, the use of assumed names cannot support an inference that Ellerup was on notice that Erna Pittman was engaged in wrongdoing.

Opinion at 10–11. The court also noted that while the jury might reasonably have concluded that Ellerup lied at trial, the fact that he gave false testimony was not sufficient to support an inference that he had been aware that Erna's taking Elizabeth to Iceland violated a valid court order.

The court also stated that its instructions as to Icelandair's duties had been flawed. In particular, the court noted that it had charged the jury that

> if an airline has actual notice that there is a court order prohibiting the parent from transporting the child to the place that is the plane's destination, it would be wrongful for the airline to transport the child.

Opinion at 4; Tr. 350. The court stated that this instruction was erroneous because Icelandair, as a common carrier, had a duty to transport anyone who sought passage and was not free to refuse to transport Erna and the girls simply because Grayson had informed it that there was a court order prohibiting Erna from removing the girls from Florida. Opinion at 5–6. Accordingly, the court stated that if the evidence were sufficient to permit the imposition of liability on Icelandair, it would grant Icelandair's alternative motion for a new trial; but that relief was mooted by the granting of judgment as a matter of law.

There having been no final adjudication of the claims against the defaulting individual defendants, the court entered a final judgment pursuant to Fed.R.Civ.P. 54(b) dismissing plaintiffs' claims against Icelandair. This appeal followed.

## II. DISCUSSION

On appeal, plaintiffs contend principally that they are entitled to have judgment entered on the jury's verdict in their favor, arguing that the district court erred (1) in finding the evidence insufficient as a matter of law, and (2) in ruling, alternatively, that Icelandair was entitled to a new trial because of an error in the court's instructions. Plaintiffs further contend that if the evidence was insufficient to support their verdict, they are entitled to a new trial because the court (a) erroneously excluded relevant evidence that would have supported their claims for interference with parental custody and (b) erroneously refused to submit to the jury their claims for negligence. We conclude that Icelandair was entitled to judgment as a matter of law.

### A. *Judgment as a Matter of Law*

■ Preliminarily, we note that three claims were submitted to the jury, to wit, interference with parental custody, intentional infliction of emotional distress, and false imprisonment, and that the verdict form inappropriately did not ask the jury to specify which of the claims it found established. *See Galdieri–Ambrosini v. National Realty & Development Corp.,* 136 F.3d 276, 285–86 (2d Cir.1998) (jury instructions should give guidance as to the elements of each claim submitted, and "when more than one claim is submitted to the jury, the trial court should foreclose the possibility of an ambiguous verdict by requiring the jury to specify its liability finding as to each claim"). On this appeal, however, plaintiffs have made no argument addressed to the claims of intentional infliction of emotional distress or false imprisonment. Accordingly, insofar as judgment as a matter of law is concerned, we need deal only with the sufficiency of the evidence to support the claim that Icelandair

aided and abetted or conspired with Erna in interfering with parental custody.

In challenging the granting of judgment as a matter of law, plaintiffs contend principally that no proper preverdict motion was made pursuant to Rule 50(a) and that, in any event, the evidence was sufficient. Icelandair, in support of judgment as a matter of law, argues not only that the evidence of notice was insufficient to establish its liability as an aider and abetter or coconspirator ("concerted-action liability"), but also that Erna's underlying conduct did not constitute an actionable tort under the law of New York—whose substantive law the parties have assumed is applicable—and hence could not provide a foundation for concerted-action liability. For the reasons discussed below, although the timing as to some of the legal arguments was less than ideal, we reject plaintiffs' procedural challenge. As to the merits, we conclude that we need not decide whether the New York courts would recognize a tort of interference with parental custody in the present circumstances, for even if such a tort were recognized, there was inadequate evidence in this case to establish concerted-action liability on the part of Icelandair.

### 1. Procedures Under Rule 50

 It is well established that a party is not entitled to challenge on appeal the sufficiency of the evidence to support the jury's verdict on a given issue unless it has timely moved in the district court for judgment as a matter of law on that issue. *See, e.g., Galdieri–Ambrosini v. National Realty & Development Corp.*, 136 F.3d at 286–87. The motion "must at least identify the specific element that the defendant contends is insufficiently supported." *Id.* at 286. A generalized challenge is inadequate. *See, e.g., Cruz v. Local Union No. 3 of the International Brotherhood of Electrical Workers*, 34 F.3d 1148, 1155 (2d Cir.1994); *Lambert v. Genesee Hospital*, 10 F.3d 46, 53–54 (2d Cir. 1993) ("the specificity requirement is obligatory"), *cert. denied*, 511 U.S. 1052, 114 S.Ct. 1612, 128 L.Ed.2d 339 (1994).

 In the present case, plaintiffs contend that Icelandair's Rule 50(a) motion at trial was inadequate because the specificity requirement was not met:

> [t]he only. grounds [Icelandair's counsel] articulated was [*sic* ]: (1) that there was no admissible evidence to support a jury verdict for "civil conspiracy, negligence, false imprisonment, and intentional infliction of .emotional distress," and (2) "[t]here has been no proof of any form that Icelandair acted intentionally … " . . . .

> This is precisely the type of general objection that fails to preserve specific grounds on which to move for judgment as a matter of law under Rule 50(b).

(Plaintiffs' brief on appeal at 22–23 (citing Tr. 294–95, 368–0).) Insofar as the issue was the sufficiency of the evidence as to notice, we reject plaintiffs' procedural argument because the pages of the trial record on which plaintiffs rely do not include all of the relevant sufficiency challenges made by Icelandair. After all of plaintiffs' fact witnesses had testified at trial, counsel for Icelandair stated that the issue in dispute was "whether Icelandair was on notice of the fact that Mrs. Pittman was not allowed to leave the United States with her daughter" and argued that "that issue should not even go to the jury because there is no evidence to establish that my client was on notice of any travel restriction with respect to the ex-Mrs. Pittman that they should have acted upon." (Tr. 266–67.) It is thus clear that, as to the question of notice, the Rule 50(a) motion was sufficiently specific.

 Insofar as Icelandair's contention is, instead, that Erna's underlying behavior did not constitute an actionable tort under New York law, we see no indication that that argument was made before the case was submitted to the jury. We note, however, that the district court may have prevented the presentation of that contention at trial by deciding to postpone complete argument on the Rule 50(a) motion until after the jury had begun its deliberations. *See, e.g.,* Tr. 268 ("I will allow you to make an adequate record. I think what we will do is, we will take up this argument while the jury is deliberating."); Tr. 294 ("Let me stop you because again I think I am going to reserve and submit the case to the jury, and I will hear you on this

motion ... while the jury is deliberating.") To the extent that Icelandair sought to argue the sufficiency of the evidence to support an element of any of plaintiffs' claims, the postponement was inappropriate. Rule 50(a) requires that, to be timely, the motion for judgment as a matter of law must be made "before submission of the case to the jury." Fed.R.Civ.P. 50(a)(2). The purpose of this timing requirement is "to give the claimant a fair opportunity to cure" any overlooked deficiencies in his proof. *Piesco v. Koch*, 12 F.3d 332, 340 (2d Cir.1993) (internal quotation marks omitted); *see, e.g., Baskin v. Hawley*, 807 F.2d 1120, 1134 (2d Cir.1986); Fed. R.Civ.P. 50 Advisory Committee Note (1991). That purpose may well be thwarted if the district court does not permit the motion to be argued until the jury has begun deliberations.

■ It is hardly clear in the present case, however, that either party was prejudiced by the delay in argument. As discussed above, Icelandair had timely argued that there was insufficient evidence of notice to permit the imposition of concerted-action liability on it, thereby giving plaintiffs an adequate opportunity to present additional evidence· if such evidence existed. Further, although it is possible that Icelandair would have added an argument, had time been allowed, that Erna's underlying behavior did not constitute an actionable tort under New York law, the record contains several indications that Icelandair would not in fact have done so. First, in seeking to be heard on the Rule 50(a) motion prior to the submission of the case to the jury, Icelandair's counsel stated that "[t]he elements of my motion are set forth in the trial memorandum filed by Icelandair in this case" (Tr. 293); that memorandum, however, did not mention the contention that New York law does not recognize the underlying tort. Second, Icelandair had stipulated prior to trial that Erna "violated a custody order in violation of Mr. Pittman's custodial rights." (Transcript of Hearing, January 29, 1997, at 3.) Third, although objecting to certain language in the court's proposed jury charge referring to Icelandair's own conduct, Icelandair endorsed the court's description of Erna herself as having "engag[ed] in this unlawful activity" (Tr. 309). And finally, the court instructed the jury, in part, that

> [t]here is no dispute in this case that the action of Erna Pittman ... in taking Elizabeth to Iceland was illegal and *violated the rights of both Mr. Pittman and his daughter* to have the daughter remain in the United States so that she could have such contact with her father as the courts of Florida deemed appropriate. *A person who has such rights may recover damages from any person who unlawfully takes or withholds the child.*
>
> Thus, *if Erna Pittman was the defendant on trial here she would be liable to both Mr. Pittman and Elizabeth for the damages they suffered as a result of Elizabeth being taken to Iceland.*

(Tr. 349 (emphasis added).) So far as we are aware, Icelandair did not object. Thus, we cannot conclude that the court's curtailment of timely oral argument on the Rule 50(a) motion at trial prevented Icelandair from airing its present contention that Erna's conduct is as a matter of law not recognized as a tort.

■ Nonetheless, the contention here that New York law does not recognize Erna's proven conduct as a tort is a purely legal argument, rather than a sufficiency challenge that, if timely asserted, could potentially be met by the presentation of additional evidence; and that contention was, eventually, made to the district court in Icelandair's posttrial memoranda. Accordingly, we reject plaintiffs' contention that Icelandair's present arguments in support of judgment as a matter of law have not been properly preserved.

### 2. *New York Law as to Interference with Parental Custody*

Notwithstanding the trial court's unobjected-to instruction that "if Erna Pittman was the defendant on trial here she would be liable to both Mr. Pittman and Elizabeth for the damages they suffered as a result of Elizabeth being taken to Iceland" (Tr. 349), the existence and contours of a tort cause of action for interference with parental custody under New York law are far from clear. As

we recently noted, "New York has very few cases dealing with this tort or related torts in this context." *Minot v. Eckardt–Minot,* 13 F.3d 590, 594 (2d Cir.1994). The question raised here by Icelandair is whether New York law recognizes, on behalf of either parent or child, a claim for damages for interference with parental custody on account of the removal of the child from the jurisdiction in violation of a court order where the removing parent, at the time of the removal, had joint custody. New York law has not provided a definitive answer.

New York cases, including one decided since *Minot,* have indicated that in some circumstances there is recognized a tort of intentional interference with parental custody. *See, e.g., Johnson v. Jamaica Hospital,* 62 N.Y.2d 523, 531, 478 N.Y.S.2d 838, 842, 467 N.E.2d 502 (1984) (ruling that parents had no cause of action against a hospital for negligence in permitting child's abduction from its nursery, but distinguishing, *obiter,* cases involving "intentional torts such as ... *willful disobedience of a court custody order*" (emphasis added)); *Casivant v. Greene County Community Action Agency, Inc.,* 234 A.D.2d 818, 819, 652 N.Y.S.2d 115, 117 (3d Dep't 1996) (mem.), *aff'd,* 90 N.Y.2d 969, 665 N.Y.S.2d 952, 688 N.E.2d 1034 (1997); *Harley v. Harley,* 170 A.D.2d 779, 781, 565 N.Y.S.2d 625, 627 (3d Dep't 1991) (mem.) ("The tort of interference with custody is not unheard of ....") (citing, *e.g., Kajtazi v. Kajtazi,* 488 F.Supp. 15, 19 (E.D.N.Y.1978)), *appeal dismissed,* 79 N.Y.2d 1035, 584 N.Y.S.2d 441, 594 N.E.2d 935 (1992). Further, some courts have indicated that a noncustodial parent who has visitation rights has a cognizable claim against the custodial parent for removal of a child from the jurisdiction in violation of the court order permitting visitation, *see, e.g., McGrady v. Rosenbaum,* 62 Misc.2d 182, 188, 308 N.Y.S.2d 181, 188 (1970), *aff'd,* 37 A.D.2d 917, 324 N.Y.S.2d 876 (1st Dep't 1971), although they have stated that the remedies for such a violation do not include money damages, *see id.* ("remedy against a spouse who violates a court order respecting custody or visitation by removing the child from the state is by way of contempt or by precluding her standing to challenge the order or to enforce its support

provisions, not by an action for damages"); *Friedman v. Friedman,* 79 Misc.2d 646, 647, 361 N.Y.S.2d 108, 109–10, (1974). On the other hand, New York courts have indicated that damages may be a proper remedy for a custodial parent who has a valid claim for intentional interference with her custodial rights in knowing violation of the custody order. *See, e.g., Lisker v. City of New York,* 72 Misc.2d 85, 89, 338 N.Y.S.2d 359, 364 (1972) (refusing to dismiss complaint seeking damages against municipal Home for the "keeping [of] plaintiff's child without lawful justification and the delivery of the child to foster parents after the Home had been notified by the mother of her right to custody of the child"). That case, however, did not deal with a defendant parent who had joint custody.

In *Casivant v. Greene County Community Action Agency, Inc.,* 234 A.D.2d 818, 652 N.Y.S.2d 115 ("*Casivant*"), the most recent pertinent state-court opinion of which we are aware, the Appellate Division stated that

> [t]he tort of intentional interference with a parent's custodial rights is rather narrow. As the Court of Appeals noted in *Johnson v. Jamaica Hosp.* (62 N.Y.2d 523, 478 N.Y.S.2d 838, 467 N.E.2d 502), cases upholding the existence of this tort have involved "violent abduction, willful disobedience of a court custody order, and wrongful detention" (*supra,* at 531, 478 N.Y.S.2d 838, 467 N.E.2d 502).

234 A.D.2d at 819, 652 N.Y.S.2d at 117. The *Casivant* court dealt with a plaintiff father who alleged that a court order had given him sole custody of three children and that the defendants (who included the children's mother and an employee of a domestic-violence shelter) had knowingly violated that order. The court held that the defendants were entitled to summary judgment dismissing the complaint where (a) the father failed to produce, in response to the summary judgment motion, the court order that he claimed had given him sole custody, and (b) the defendants stated under oath that they did not know of an order awarding the father sole custody and believed instead that the mother and father had joint custody. The *Casivant* court's emphasis that defendants' "assump-

tion that the parents shared custody of the children was certainly not unreasonable," *id.* at 820, 652 N.Y.S.2d at 117, may well indicate that custodial interference by or at the behest of a parent who had joint custody would not have been viewed as tortious. *See generally Restatement (Second) of Torts* § 700 comment *c* (1976) ("When the parents are by law jointly entitled to the custody . . . of the child, no action can be brought against one of the parents who abducts or induces the child to leave the other."). Even so, however, *Casivant* would not necessarily resolve the actionability of Erna's conduct here, for *Casivant* did not involve a court order expressly prohibiting one parent from removing the children from the court's jurisdiction. Nor did it purport to address the rights of the children themselves.

There is little authority as to the standing of a child, such as Elizabeth, to assert a claim of interference with custodial rights, but what little state authority we have found suggests that a child cannot maintain such an action. *See, e.g., Offenhartz v. Cohen,* 168 A.D.2d 268, 268, 562 N.Y.S.2d 500, 501 (1st Dep't 1990) (mem.) (indicating that child could not hold her custodial parent liable for abduction, and remarking that "cause of action for abduction belongs solely to a parent"); *Restatement (Second) of Torts* § 700 (one who interferes with a parent's right to custody "is subject to liability *to the parent*" (emphasis added)); *cf. Harley v. Druzba,* 148 Misc.2d 564, 566–67, 560 N.Y.S.2d 959, 961 (1990) (dismissing sibling's claim for custodial interference where sibling had not been awarded custody, though refusing to dismiss her statute-based claim to visitation); *Whalen v. County of Fulton,* 941 F.Supp. 290, 299 (N.D.N.Y.1996) (brother could not maintain an action for custodial interference) *aff'd,* 126 F.3d 400 (1997); *but cf. Bennett v. Town of Riverhead,* 940 F.Supp. 481, 488–89 (E.D.N.Y.1996) (parents have a constitutionally protected liberty interest against governmental interference with the custody of their children, and "[t]his interest is reciprocal in that it belongs to the children as much as it does to parents").

In sum, the validity of Icelandair's contention that the New York courts would not recognize a cause of action in favor of either Frederick or Elizabeth for money damages against Erna, Elizabeth's joint custodian, for traveling with Elizabeth in violation of a court order, is unclear. We conclude, however, that we need not decide that question in this case, for Icelandair is sued as an aider and abetter or coconspirator; and while it cannot be held liable on such a concerted-action theory if Erna herself has not committed a cognizable tort, *see, e.g., Rastelli v. Goodyear Tire & Rubber Co.,* 79 N.Y.2d 289, 295, 582 N.Y.S.2d 373, 375, 591 N.E.2d 222 (1992) ("It is essential that [*inter alia* ] . . . one of the defendants committed an act in pursuance of the agreement which constitutes a tort . . . ."), it also cannot be held liable if any of the other elements of a concerted-action claim have not been established. Since, for the reasons discussed in the following section, we conclude that the notice element of concerted action was not established, we leave it to the "state . . . [to] lead the way in developing its law in this area, balancing the delicate issues involved." *Minot v. Eckardt–Minot,* 13 F.3d at 594.

### 3. *Sufficiency of the Notice to Icelandair*

Concerted-action liability under New York law is based on the principle that "[a]ll those who, in pursuance of a common plan or design to commit a tortious act, actively take part in it, or further it by cooperation or request, or who lend aid or encouragement to the wrongdoer . . . are equally liable with him." *Bichler v. Eli Lilly & Co.,* 55 N.Y.2d 571, 580, 450 N.Y.S.2d 776, 780, 436 N.E.2d 182 (1982) (internal quotation marks omitted); *see, e.g., Vanacore v. Teigue,* 664 N.Y.S.2d 604, 605 (2d Dep't 1997) (mem.). The elements of concerted-action liability are (1) an express or tacit agreement "to participate in a common plan or design to commit a tortious act," (2) tortious conduct by each defendant, and (3) the commission by one of the defendants, in pursuance of the agreement, of an act that constitutes a tort. *Rastelli v. Goodyear Tire & Rubber Co.,* 79 N.Y.2d at 295, 582 N.Y.S.2d at 375, 591 N.E.2d 222 (internal quotation marks omitted). Conspiracy and aiding and abetting are varieties of concerted-action liability: conspiracy requires an agreement to commit

a tortious act, *see, e.g., Lindsay v. Lockwood,* 163 Misc.2d 228, 234, 625 N.Y.S.2d 393, 397 (1994); *Restatement (Second) of Torts* § 876(a), aiding and abetting requires that the defendant have given "'substantial assistance or encouragement'" to the primary wrongdoer, *Lindsay v. Lockwood,* 163 Misc.2d at 232, 625 N.Y.S.2d at 396 (quoting *Restatement (Second) of Torts* § 876(b)). In order to be liable for acting in concert with the primary tortfeasor under either theory, the defendant must know the wrongful nature of the primary actor's conduct. *See, e.g., National Westminster Bank USA v. Weksel,* 124 A.D.2d 144, 147, 511 N.Y.S.2d 626, 629 (1st Dep't) (neither conspiracy nor aiding-and-abetting liability is sustainable where there is no allegation that defendant knew of or intended to aid in the commission of a tort), *appeal denied,* 70 N.Y.2d 604, 519 N.Y.S.2d 1027, 513 N.E.2d 1307 (1987).

In the present case, there was evidence that Icelandair, contrary to its own prescribed procedures, allowed Erna and the girls to fly using tickets issued in names different from the names on their reservations or on their passports; that it falsified the weight-and-balance codes to disguise the fact that the "Karlsson" party consisted of a woman and two children; that Jonsson had a relationship with Icelandair that predisposed its employees to do favors for him and his relatives; and that Ellerup lied at trial about his involvement in checking in Erna at JFK Airport. Thus, there was ample evidence from which the jury could reasonably infer that Icelandair knew Erna sought to leave the country surreptitiously and that it intentionally assisted her in doing so.

But, as the district court discussed, knowledge that conduct is clandestine does not necessarily include knowledge of its motivation or legality. Plaintiffs argue that Icelandair had the burden of producing evidence that its subjective intent was other than to help Erna violate the court order, and that the district court, by hypothesizing that a woman might well be traveling surreptitiously in order to escape from an abusive husband, rather than to evade a court order, "invaded the exclusive province of the jury to select among competing, reasonable infer-

ences" (Plaintiffs' brief on appeal at 18). Plaintiffs' arguments are wide of the mark, for the thrust of the district court's observation was that knowledge of the existence of a court order could not reasonably be inferred from suspicious circumstances alone. The question was whether the airline had been given adequate notice to cause it to know that Erna was committing a tort because her travel to Iceland with Elizabeth was prohibited by court order.

The only evidence in this case as to Icelandair's "knowledge" that there was a court order restricting Erna's travel with Elizabeth was Grayson's testimony describing his calls to the Baltimore–Washington and Orlando offices of Icelandair. Grayson told Icelandair employees, whose names he did not obtain and whose titles he did not know, of his fear that Erna would attempt to leave the country illegally, and told them there was a court order prohibiting Erna from taking the girls out of northwest Florida. More significant, however, is what Grayson did not do. He did not, for example, contact the airline's New York offices, where Icelandair's senior United States employees were located, or ask to speak with a high-ranking officer. He did not make any request of, or give any information to, Icelandair in writing. And he did not provide Icelandair with certified copies (or indeed any copies) of the court orders restricting Erna's travel with her daughters. Thus, crediting Grayson's testimony fully, the evidence as to Icelandair's knowledge was simply that two outlying Icelandair offices had received calls from a man whose identity was not documented (who, indeed, was not Pittman and could have been anyone), who spoke to random employees, and who represented orally that Erna's travel with the girls was restricted by court orders as to whose existence and authenticity he provided no proof.

As the district court noted, Icelandair, as a common carrier, had a general duty to receive and transport persons who offered themselves as paying passengers. We reject the notion that the New York courts would consider that duty erased, and a contrary duty imposed, on the basis of mere oral representations such as those made here.

Accordingly, regardless of whether the other elements of concerted-action liability are proven, and whatever authenticated type of notice the New York courts might ultimately require in order to impose such liability on a common carrier, we cannot infer that the state courts would find that the knowledge element of such a claim was established by Grayson's telephone calls.

### B. The Exclusion of Alfredsdottir's Statement

Plaintiffs also contend that if we find the evidence insufficient we should remand for a new trial on the ground that the district court erred in not allowing them to introduce an out-of-court statement by Icelandair flight attendant Katrin Alfredsdottir. Alfredsdottir's statement was proffered through Rhonda Schwartz, a television news producer whose deposition testimony described a conversation she had with Alfredsdottir on an Icelandair flight in 1993 when Alfredsdottir observed her reading newspaper clippings about Erna and the girls. Schwartz testified that Alfredsdottir commented,

> "You know we helped sneak"—snuck or smuggled, I really don't recall precisely— "them out the back way or service entrance at Dulles Airport."
>
> And I asked her "Oh, were you involved in that? Do you know about this yourself?"
>
> And she said "No, no, this is just a story that I have heard," and then she left.

Icelandair admitted that Alfredsdottir was an Icelandair flight attendant on Schwartz's 1993 flight and was a member of the crew on the flight that took Erna and Elizabeth to Iceland on May 1, 1992, and plaintiffs contend that Alfredsdottir's statement was a vicarious admission that should have been deemed nonhearsay under Fed.R.Evid. 801(d)(2)(D). For several reasons we see no error in its exclusion.

■ First, since the Schwartz deposition testimony was that Alfredsdottir stated she was repeating a story she had heard from someone else, double-hearsay analysis is required. The first level of inquiry is whether Schwartz's testimony as to what Alfredsdottir said is hearsay, and plaintiffs' vicarious-

admission theory deals only with that first level. Even if Schwartz's testimony were deemed nonhearsay on the theory that statements by Alfredsdottir were attributable to Icelandair, however, the content of Alfredsdottir's statement was itself hearsay because, as " 'a story that I have heard,' " it purported to describe statements made to her by others. No basis having been shown for classifying the statement attributed to the unidentified source of Alfredsdottir's statement either as nonhearsay or as an exception to the hearsay rule, the statement attributed to Alfredsdottir was properly excludable on the ground that it contained hearsay. *See, e.g., Zaken v. Boerer,* 964 F.2d 1319, 1324 (2d Cir.), *cert. denied,* 506 U.S. 975, 113 S.Ct. 467, 121 L.Ed.2d 375 (1992); *Carden v. Westinghouse Electric Corp.,* 850 F.2d 996, 1002–03 (3d Cir.1988).

■ Second, even if Alfredsdottir's statement neither was nor contained hearsay (and if by " 'Dulles Airport' " she meant JFK Airport), its exclusion would provide no basis for a new trial, for it did not indicate that Icelandair knew that the reason for Erna's furtive flight was violation of a court order. Given the admitted evidence that Icelandair behaved in unorthodox fashion, from which it could easily be inferred that it knew Erna's flight was surreptitious, Alfredsdottir's reference to " 'sneak[ing]' " Erna and the girls out would have added little. As discussed in Part II.A.3. above, evidence of surreptitious intent was insufficient since Icelandair had not received legally sufficient notice of the court order. Admission of Alfredsdottir's statement could not have cured that defect.

### C. Dismissal of Negligence Claims

Plaintiffs also contend that if we find the evidence insufficient to sustain the verdict in their favor for intentional interference with parental custody, they are entitled to a remand for a new trial on Elizabeth's claim of negligence and Frederick's claim of gross negligence, which the court refused to submit to the jury. We disagree.

In order to establish a negligence claim under New York law a plaintiff must show, *inter alia,* that the defendant owed the plain-

tiff a duty of care and breached that duty. *See, e.g., Stagl v. Delta Air Lines, Inc.,* 117 F.3d 76, 79 (2d Cir.1997). For example, in *Johnson v. Jamaica Hospital,* in which parents sued a hospital for negligent infliction of emotional distress resulting from the abduction of their infant daughter from the hospital nursery, the New York Court of Appeals held that the defendant hospital owed no duty directly to the parents to prevent the child's abduction. *See* 62 N.Y.2d at 526–30, 478 N.Y.S.2d at 839–41, 467 N.E.2d 502.

■ In the present case, Frederick similarly lacked a viable negligence claim because Icelandair owed him no duty of care. In relation to Icelandair, Frederick was a member of the general public; he had not entered into any special relationship with the airline. And although Icelandair certainly owed some duties of care to Elizabeth as a passenger, we have seen no authority for the proposition that a common carrier has a duty—either generally or based on oral representations— to ensure that a minor traveling with a custodial parent is not being transported in violation of a court order. As discussed in Part II.A.3. above, the telephone calls by Grayson to Icelandair's Orlando and Baltimore–Washington offices were insufficient.

## CONCLUSION

We have considered all of plaintiffs' arguments on this appeal and have found in them no basis for reversal. The judgment of the district court dismissing the complaint as a matter of law is affirmed.

No costs.