*576 OPINION OF THE COURT
Meyer, J.
To the extent the issue has been preserved for our review, the trial court’s instructions concerning defendant pharmaceutical manufacturer’s liability on a concerted action theory for injuries caused by prenatal exposure to diethylstilbestrol (DES) were not erroneous as a matter of law. Evaluating the evidence in light of those instructions, which became the governing law, we cannot say that the jury’s verdict is without a sufficient factual foundation. The order of the Appellate Division should, therefore, be affirmed.
I
DES is a powerful synthetic substance that duplicates the activity of estrogen, a female sex hormone naturally present in all women and, in lesser amounts, present also in men. Invented in 1937 by British researchers, DES was never patented. As a result, it was available for production and marketing to any pharmaceutical manufacturer who obtained Federal Food and Drug Administration (FDA) approval.
DES was first approved for use in the United States in 1941. In that year, 12 pharmaceutical manufacturers, including defendant Eli Lilly and Company, submitted separate new drug applications (NDA’s)[1] to the FDA requesting approval of the marketing of DES for the treatment of vaginitis, engorgement of the breasts, excessive menstrual bleeding and symptoms of menopause. Each separate application, however, relied upon a master file of reports and studies compiled by a committee of four drug companies, known as the “Small Committee,” which was chaired by Lilly. Three years later the FDA approved several additional NDA’s for use of DES in treating cancer of the prostate in males. DES continues to be used to treat some of these non-pregnancy-related medical problems today.
*577 Not until 1947 did the FDA approve DES for the treatment of human miscarriage. Lilly’s NDA was the second such application to be approved. Five years later, in 1952, the FDA did away with the need for additional NDA’s, at least for previously approved uses, when it declared DES to be “generally recognized * * * as safe.” In 1971, however, in the face of mounting evidence that DES was ineffective in preventing miscarriage and dangerous to the unborn child as well, the FDA reversed itself and banned the use of DES for the treatment of problems of pregnancy. By that time DES had been taken by perhaps several million pregnant mothers.
In the past decade the link between prenatal DES exposure and the later development in female offspring of clear cell cervical or vaginal adenocarcinoma, a hitherto rare disease involving cancerous growth in glandular tissue, has been unquestionably confirmed (see L 1978, ch 715, § 1; Note, Market Share Liability: An Answer to the DES Causation Problem, 94 Harv L Rev 668, 669, n 8, and authorities cited therein). In addition, the FDA estimated in 1975 that 30 to 90% of these offspring develop vaginal adenosis, a noncancerous condition in which glandular tissue normally found only in the cervix is also found in the vagina (Sheiner, DES and a Proposed Theory of Enterprise Liability, 46 Ford L Rev 963, 965, n 10). Because of the “paramount public importance” of identifying, screening, diagnosing, caring for and treating the estimated more than 100,000 New York women whose health has been endangered by prenatal exposure to DES (L 1978, ch 715, § 1), the Legislature has enacted section 2500-c of the Public Health Law aimed at locating, monitoring and establishing special programs for these young women.
Plaintiff Joyce Bichler is a DES daughter. Stricken by cervical and vaginal cancer at age 17, she brought suit against Lilly in 1974 for damages sustained in surgically arresting the disease.[2] All of plaintiff’s internal reproductive organs and more than half of her vagina were removed. As a result, she can never bear children and will never enjoy normal sexual relations.
*578 In her complaint plaintiff alleged that her 1953 prenatal exposure to DES, ingested by her mother while pregnant with plaintiff, was the proximate cause of the cancer that developed 17 years after her birth in 1954. Lilly, a major American manufacturer of DES, was the only pharmaceutical manufacturer named as defendant,[3] although the pharmacist who filled plaintiff’s mother’s 1953 prescription stocked DES supplied by at least three of the other 147 drug companies then manufacturing and marketing DES for pregnancy-related problems.
At Lilly’s request, the trial was conducted in two stages. The first stage of the trial concerned the identity of the manufacturer of the DES tablets taken by plaintiff’s mother. The jury found that plaintiff had not established by a preponderance of the evidence that Lilly was that manufacturer. The second stage of the trial concerned Lilly’s liability upon a theory of concerted action. The jury determined that Lilly and other DES manufacturers wrongfully marketed the drug for use in preventing miscarriage without first performing laboratory tests upon pregnant mice. Had those tests been performed, the jury found, the pharmaceutical companies would have learned that DES was capable of causing cancer to develop in female offspring and would not have marketed the drug for problems of pregnancy. The jury awarded plaintiff $500,000 and the Appellate Division unanimously affirmed the judgment entered upon the jury’s verdict.[4]
We dismissed Lilly’s appeal taken as of right on constitutional grounds (54 NY2d 752), but granted its motion for *579 leave to appeal to our court (54 NY2d 610). Lilly seeks reversal on two principal grounds: that the trial court’s instructions on concerted action liability were erroneous, and that the evidence before the jury was legally insufficient to support a verdict in plaintiff’s favor on the issue of concerted action. For the reasons which follow, we reject these arguments.
II
In the wake of knowledge about the devastation wrought by DES upon the female offspring of the several million pregnant women who ingested the drug over a 25-year period, an estimated 1,000 individual or class action products liability lawsuits have been lodged against pharmaceutical manufacturers (Note, 94 Harv L Rev, at p 669). Where the identity of the drug company that manufactured the DES which caused plaintiff’s injuries is known, these lawsuits can be prosecuted within well-established principles of products liability as those principles have been adapted to the manufacturing and marketing of prescription drugs. It is, however, the far more usual case that the identity of the drug company whose DES tablets were taken by a plaintiff’s mother is unknown and can never accurately be determined. This is because all DES prescribed for pregnant mothers was produced under the identical chemical formula and most of this DES was manufactured and prescribed generically. With the passage of the many years needed for DES-caused vaginal tract abnormalities to appear in prenatally exposed offspring, the patient, physician, pharmacist and drug company records which could have identified the source of the DES have usually disappeared. This same lapse of time has commonly obliterated the individual recollections of those surviving witnesses of any underlying DES transaction. The result is that as a group DES daughters face a dilemma: They have, if their claim is upheld, been injured by parallel conduct of a group of pharmaceutical manufacturers. But the practical impossibility for most victims of pinpointing the manufacturer directly responsible for their particular injury threatens to bar any recovery.
Products liability law cannot be expected to stand still where innocent victims face “inordinately difficult prob *580 lems of proof” (Caprara v Chrysler Corp., 52 NY2d 114, 123). Thus, courts as well as commentators have proposed means which permit recovery by prenatally exposed DES daughters. The proposals involve the application of already accepted tort principles of “concerted action” and “alternative liability” to the unusual DES fact pattern as well as resort to more novel theories of “enterprise” and “market share” liability.[5] Here, because only concerted action was pleaded and submitted to the jury, we address only this basis of liability. We expressly leave for another day consideration of whether other theories of liability may in the DES context establish a cause of action.
Concerted action liability rests upon the principle that “[a]ll those who, in pursuance of a common plan or design to commit a tortious act, actively take part in it, or further it by cooperation or request, or who lend aid or encouragement to the wrongdoer, or ratify and adopt his acts done for their benefit, are equally liable with him” (Prosser, Torts *581 [4th ed], § 46, at p 292; see, also, Restatement, Torts 2d, § 876). An injured plaintiff may pursue any one joint tortfeasor on a concerted action theory (see Graphic Arts Mut. Ins. Co. v Bakers Mut. Ins. Co. of N. Y., 45 NY2d 551). Such tort-feasor may, in turn, seek contribution from others who acted in concert with him (see Dole v Dow Chem. Co., 30 NY2d 143). The clearest example of concerted action liability is the drag race. Where two drivers agree to race and one collides with and injures a third party, the other driver is fully responsible for the third party’s injuries even though there was no contact between that driver’s car and the injured person (see, e.g., De Carvalho v Brunner, 223 NY 284; and NY PJI 2:265, and Comment).
Although Lilly claims it is jurisprudentially unsound to permit full recovery on a concerted action theory against one DES manufacturer for injuries probably sustained by ingestion of DES manufactured by another manufacturer, no motion was ever made by Lilly to dismiss the complaint for failure to state a cause of action, for partial summary judgment limiting plaintiff’s recovery to a percentage amount of her injuries corresponding to Lilly’s market share, or to join other DES manufacturers as necessary parties. Nor were these issues raised in Lilly’s motions to dismiss for failure to make out a prima facie case or for a directed verdict. Rather, Lilly proceeded to trial on a complaint seeking full recovery against Lilly alone among the manufacturers on the basis of concerted action. This, then, has become the controlling law and we look only to the trial court’s instructions on concerted action to determine whether, to the extent the issue has been preserved, those instructions were erroneous.
The totality of the trial court’s instructions on concerted action was as follows:
“[B]y ‘concerted action,’ we mean one of two things. First, action taken jointly by the drug companies as a result of an express or implied understanding. In this case, *582 other than in connection with the original New Drug Application submitted in 1941 by some twelve companies, in which they expressly agreed to joint submission of clinical data, plaintiff contends that the joint action of the defendant and other drug companies, in testing and marketing D. E. S. for use in accidents of pregnancy was by implied or tacit agreement or understanding. That is, it was unspoken, and that this was reflected by the consciously parallel conduct of the companies in these activities.
“By the second definition of concerted action, we mean persons acting independently of each other in committing the same wrongful act, but although acting independently, their acts have the effect of substantially encouraging or assisting the wrongful conduct of the other, which, in this case, was the alleged failure to adequately test.
“Thus, if you find that defendant and the other drug companies either consciously paralleled each other in failing to test D. E. S. on pregnant mice, as a result of some implied understanding, or that they acted independently of each other in failing to do such testing, but that such independent actions had the effect of substantially aiding or encouraging the failure to test by the others, then you should find that the defendant wrongfully acted in concert with the other drug manufacturers in the testing and marketing of D. E. S. for use in accidents of pregnancy. Of course, you must also have found that it was wrongful for the defendant and the other drug companies not to have tested D. E. S. in pregnant mice because of the state of knowledge that was available to them in 1953.”
Lilly’s challenge to these instructions separately addresses concerted action by agreement and concerted action by substantial assistance, the two branches of the court’s quoted charge. With respect to concerted action by agreement, Lilly contends that the jury should have been instructed that (1) direct evidence or some “plus factor” was needed in addition to conscious parallelism to support a finding of agreement; (2) concerted action liability required every drug company that might have manufactured the DES tablets taken by plaintiff’s mother be a party to *583 such agreement; and (3) no such agreement could be a predicate for concerted action liability unless it concerned either affirmative commission of a negligent act or intentional omission of a nonact. With respect to concerted action by substantial assistance, Lilly contends that the jury should have been instructed that (1) a finding of agreement was necessary to impose liability; and (2) Lilly must itself have inflicted some injury upon plaintiff. In addition, Lilly claims the court inadequately defined “substantial assistance.”
We need not decide the merits of these claims, for none has been preserved for our review by appropriate request or exception. Before the court delivered its charge, Lilly handed up a series of more .than 20 requests to charge, including one on concerted action, covering virtually every aspect of the case. The court accepted this submission without ruling on what requests, if any, were accepted and what, if any, were rejected. At the conclusion of the charge, which covered the same ground as many of Lilly’s requests, Lilly’s trial counsel was given an opportunity to make specific requests and note specific exceptions. Several specifically numbered requests previously handed up, not including the concerted action request, were thus expressly brought to the trial court’s attention. Each was expressly denied. We can only conclude that any request previously handed to the court which was not at this time specifically renewed, including the concerted action request, was either abandoned or withdrawn. As for exceptions, the only exception taken to the concerted action portion of the charge was as follows: “[0]n the issue of concerted action. In accordance with our specific request to charge, and I’m sorry, Your Honor, I don’t have the number, I believe there must be proof of intent.”
The request to charge apparently referred to by this remark was the concerted action request already mentioned. It is quoted in its entirety in the margin.[6] In our *584 opinion, the portions of this numbered request which concern intent do not even arguably relate to any of the six claimed errors in the trial court’s concerted action charge that are now urged in support of reversal. Accordingly, the court’s charge on concerted action is the law governing this case under which the legal sufficiency of the evidence to support the jury’s finding of concerted action must be assessed (see Knobloch v Royal Globe Ins. Co., 38 NY2d 471, 477; Martin v City of Cohoes, 37 NY2d 162, 165; CPLR 4110-b).
Ill
Because the trial court submitted two theories of concerted action upon which Lilly’s liability for plaintiff’s injuries could be premised — concerted action by agreement and concerted action by substantial assistance — and we do not know which theory was accepted by the jury, we must evaluate the sufficiency of the evidence to support recovery under either (Davis v Caldwell, 54 NY2d 176, 179-180). As we read the trial court’s instructions on concerted action by agreement, the jury is permitted to infer from evidence of consciously parallel behavior that an implied agreement existed between Lilly and other drug companies to market DES for problems of human pregnancy without first conducting tests with DES upon pregnant mice. No “direct evidence” or “plus factor” is required. Consciously parallel conduct by itself is enough. Similarly, the trial court’s charge on concerted action by substantial assistance required the jury to find only that Lilly’s failure to test DES on pregnant mice before marketing the drug for use by pregnant women substantially aided or encouraged other DES manufacturers to do the same. No express agreement is required. Nor is it necessary for the jury to *585 find that Lilly itself was responsible for the manufacture of the DES tablets taken by plaintiff’s mother.
Review of the evidence, solely on the basis of events beginning in 1947,[7] shows that it was sufficient to support jury findings of both conscious parallelism and substantial assistance or encouragement under the jury instructions to which no exception was taken. The record shows that eight companies filed NDA’s to market DES for problems of pregnancy between April, 1947 and October, 1948. Lilly’s application was the second of these, filed only two weeks after the leader. Each of the eight applications relied substantially on the same studies of three research teams that were reported between 1941 and 1947.[8] Each requested approval to market 25 milligram tablets, a dosage five times more powerful than the maximum five milligram tablets approved in 1941. For the jury to infer that this closely parallel conduct was conscious or that Lilly’s participation in this first wave of DES pregnancy-related NDA filings substantially encouraged the other 140 companies which were engaged in manufacturing and marketing DES for the same, purpose by 1953 is surely within the realm of the fact-finding function..
IV
Although this analysis disposes of Lilly’s principal contentions, there are two remaining issues raised by Lilly *586 which merit brief discussion. First, Lilly claims that the evidence was insufficient to support a determination that cancer to the offspring was a foreseeable risk of prenatal DES exposure. Second, Lilly argues that the trial court erroneously declined to instruct the jury about Lilly’s duty to warn.
Concerning proof of foreseeability, Lilly conceded at trial that it was aware by 1947 that DES posed the threat of cancer to the user, that DES had been shown to cross the placental barrier and that DES had caused malformations in the offspring of pregnant mice to which the drug had been administered. Lilly contends, however, that because no human transplacental carcinogen was discovered until 1962, when the first thalidomide babies were born, it could not have foreseen the occurrence of DES-caused cancer in human offspring. Although Lilly’s experts supported this position, plaintiff’s experts testified to the contrary conclusion, which the jury accepted and which we have no reason to disturb. We note, moreover, that the proof shows that a researcher had in 1947 conducted an experiment in which pregnant mice were injected with urethane, an anesthetic administered to women during delivery, in order to determine if the offspring developed cancer from the drug.[9] Obviously, this researcher was concerned about a human transplacental carcinogen.
Concerning the duty to warn, Lilly’s argument has two branches. First, Lilly contends that since all drugs are inherently unsafe, liability for a “side-effect” can only be imposed if the side-effect was foreseeable and if the manufacturer failed to include a warning about it in the literature accompanying the drug (see Restatement, Torts 2d, § 402A, Comment k). Second, Lilly contends that the jury should have been instructed that no liability can be found against a drug manufacturer if the physician did not rely upon or consider product literature and warnings in prescribing the drug (see Wolfgruber v Upjohn Co., 52 NY2d 768, affg on 72 AD2d 59). We have, however, no opportunity to consider the application of these principles to this case because plaintiff’s theory of liability went far beyond *587 them. As the series of special interrogatories submitted to the jury demonstrates,[10] plaintiff could only recover if knowledge that DES might cause cancer in the offspring of pregnant mothers would have caused a reasonably prudent drug manufacturer not to market DES for problems of pregnancy at all, as opposed to marketing the drug with appropriate warnings. This formulation of plaintiff’s burden was never objected to by Lilly. That being the case, whatever the merits of Lilly’s claims are to a products liability drug case brought on a duty to warn theory, they have no application to this case pleaded and proved exclusively on a failure to test theory.
We have considered Lilly’s remaining arguments and find them to be either unpreserved or without merit. The order of the Appellate Division should therefore be affirmed, with costs.
Chief Judge Cooke and Judges Jasen, Gabrielli, Jones, Wachtler and Fuchsberg concur.
Order affirmed.

. A “new drug” is defined as: “Any drug the composition of which is such that such drug is not generally recognized, among experts qualified by scientific training and experience to evaluate the safety of drugs, as safe for use under the conditions prescribed, recommended, or suggested in the labeling thereof” (Federal Food, Drug, and Cosmetic Act, ch 675, § 201, subd [p], par [1], 52 Stat 1040,1041-1042 [current version at US Code, tit 21, § 321, subd (p), par (1)]).

. Plaintiff’s father’s derivative claims were dismissed as time barred and are not before us.

. Also named as defendants were the physician who prescribed the DES for plaintiff’s mother in 1953 and the hospital where the 1972 surgery was conducted. In a separate action, subsequently consolidated with this action, plaintiff sued the pharmacist who filled the 1953 prescription. The action against the physician was settled. The action as against the hospital was voluntarily discontinued after a finding in favor of the hospital by a medical malpractice panel. The action as against the pharmacist was dismissed upon motion for summary judgment (see Bichler v Willing, 58 AD2d 331, app dsmd [May 12, 1978]). A third action for the same damages by plaintiff against Lilly and the three other companies whose DES products were sold by the pharmacist in 1953 is now pending in Supreme Court.

. Reduced by the amount of the physician’s settlement (see n 3, supra), the verdict resulted in judgment for plaintiff of $492,842.39.

. “Alternative liability,” like concerted action liability, is joint and several. It applies “[w]here the conduct of two or more actors is tortious, and it is proved that harm has been caused to the plaintiff by only one of them, but there is uncertainty as to which one has caused it” (Restatement, Torts 2d, § 433B, subd [3]). In such a case, “the burden is upon each such actor to prove that he has not caused the harm” (id.). It is classically illustrated by Summers v Tice (33 Cal 2d 80) where two hunters negligently fired simultaneously in plaintiff’s direction, but plaintiff was struck by only one bullet (see, also, Hawkes v Goll, 256 App Div 940, affd 281 NY 808; and NY PJI 2:307). Recovery under an alternative liability theory requires joinder of all the parties who could have been responsible for a plaintiff’s injuries (Restatement, Torts 2d, § 433B, subd [3], Comment h). It has been accepted as a basis for proceeding to trial against DES manufacturers in a multidefendant products liability action (e.g., Abel v Lilly & Co., 94 Mich App 59). “Enterprise liability,” also joint and several, derives from the opinion in Hall v Du Pont de Nemours & Co. (345 F Supp 353). In that case, plaintiffs were unable to identify the manufacturers of allegedly unsafe blasting caps for the simple reason that the caps had been obliterated by explosion. Since the six defendants in that case did, however, comprise virtually the entire American blasting cap industry and since it appeared that their blasting caps were manufactured to meet industry-wide safety standards set by their own trade association, the court held that defendants could be liable for the joint control of the risk of accidental explosion. It has been suggested that this basis of liability is applicable to the DES cause (see 46 Ford L Rev 963). “Market share liability,” accepted by the Supreme Court of California in Sindell v Abbott Labs. (26 Cal 3d 588, cert den 449 US 912), is a hybrid of alternative and enterprise liability. Sindell held that a DES plaintiff need only join as defendants a sufficient number of DES manufacturers to embrace a “substantial share” of the DES market at the time plaintiff’s mother ingested the drug. Any defendant could avoid liability by proving that it could not have manufactured the tablets in question, but failing that, will be held liable only for that percentage of the plaintiff’s injuries that corresponds to its percentage share of the market, not for the entire damage suffered by plaintiff.

. “In order to impose liability on Lilly for ‘concerted action,’ you must find four separate things: (1) Lilly and other companies that have been specifically identified had a' common intention or an agreement by which the members of the group acted together *584 to obtain approval to market stilbestrol for the treatment of accidents of pregnancy in 1947; (2) a member of this group manufactured the stilbestrol used by Joyce Bichler’s mother; (3) Lilly and the rest of the group substantially assisted the actual manufacturer and the injury would not have occurred without that assistance; and (4) Lilly intended to assist the conduct of the manufacturer whose drug caused the injury, or Lilly knew of the wrongful conduct of the actual manufacturer and was aware that its own acts furthered that conduct.
“If you do not find all of these things, then you cannot find Lilly liable for ‘concerted action.’ Mere knowledge by Lilly of what the other manufacturers were doing is not sufficient to make Lilly liable for the acts of another manufacturer. You are further *585 instructed that one who innocently and carefully does an act which furthers the wrongful purpose of another is not acting in concert with him.”

. We agree with Lilly that its 1941 collaboration with other pharmaceutical manufacturers to secure initial FDA approval of DES for certain non-pregnancy-related conditions has no bearing upon the concerted action which plaintiff must establish in connection with Lilly’s 1947 supplemental application to produce and market DES for problems of pregnancy (see Morton v Abbott Labs., 538 F Supp 593; Ryan v Lilly & Co., 514 F Supp 1004; Payton v Abbott Labs, 512 F Supp 1031; Lyons v Premo Pharm. Labs., 170 NJ Super 183, certification den 82 NJ 267).

. (Kamaky, Use of Stilbestrol for the Treatment of Threatened and Habitual Abortion and Premature Labor, 35 So Med J 838 [Sept., 1942]; Kamaky, Estrogenic Tolerance in Pregnant Women, 53 Amer J Obstet & Gynec 312 [Feb., 1947]; Rosenblum & Melinkoff, Preservation of the Threatened Pregnancy with Particular Reference to the Use of Diethylstilbestrol, 55 West. J Surg Obstet & Gynec 597 [1947]; Smith & Smith, Increased Excretion of Pregnanediol in Pregnancy from Diethylstilbestrol with Special Reference to the Prevention of Late Pregnancy Accidents, 51 Amer J Obstet & Gynec 411 [1946].)

. (Larsen, Weed & Rhodes, Pulmonary Tumor Induction by Transplacental Exposure to Urethane, 8 J Nat Cancer Inst 63 [1947].)

. The interrogatories, all of which were answered in plaintiff’s favor, were as follows: “(1) Was DES reasonably safe in the treatment of accidents of pregnancy when it was ingested by plaintiff’s mother in 1953? (2) Was DES a proximate cause of plaintiff’s cancer? (3) In 1953 when plaintiff’s mother ingested DES, should the defendant, as a reasonably prudent drug manufacturer, have foreseen that DES might cause cancer in the offspring of pregnant women who took it? (4) Foreseeing that DES might cause cancer in the offspring of pregnant women who took it, would a reasonably prudent drug manufacturer test it on pregnant mice before marketing it? (5) If DES had been tested on pregnant mice, would the tests have shown that DES causes cancer in their offspring? (6) Would a reasonably prudent drug manufacturer have marketed DES for use in treating accidents of pregnancy at the time it was ingested by the plaintiff’s mother if it had known that DES causes cancer in the offspring of pregnant mice? (7) Did defendant and the other drug manufacturers act in concert with each other in the testing and marketing of DES for use in treating accidents of pregnancy?”