THE CAYUGA INDIAN NATION OF NEW YORK, et al., Plaintiffs,

and

The Seneca–Cayuga Tribe Of Oklahoma, Plaintiff–Intervenor,

and

United States of America, Plaintiff–Intervenor;

v.

George P. PATAKI, et al., Defendants.

Nos. 80–CV–930, 80–CV–960.

United States District Court, N.D. New York.

Oct. 8, 1999.

*Id.* at 1013 (citation omitted).

Rubin Baum Levin Constant & Friedman, New York City (Martin R. Gold, Raymond J. Heslin, of counsel), for Plaintiffs Cayuga Indian Nation of New York.

Mariscal Weeks McIntyre & Friedlander, Phoenix, AZ (Glenn M. Feldman, of counsel), for Plaintiff–Intervenor Tribe.

Hank Meshorer, U.S. Department of Justice, Environment & Natural Division, Washington, DC, for Plaintiff–Intervenor United States.

Eliot Spitzer, Attorney General of the State of New York, Albany, NY (David B. Roberts, Assistant Attorney General, of counsel), for State Defendants.

Huber Lawrence & Abell, New York City, (Theodore F. Duver, of counsel), for Def. New York State Electric & Gas Corporation.

Goodwin Procter & Hoar, Boston, MA, (Anthony M. Feeherry, of counsel), for Miller Brewing and Def. Class.

Harris Beach & Wilcox, Rochester, NY, (William L. Dorr, Brian Laudadio, of Counsel), for Def. Counties.

## MEMORANDUM–DECISION AND ORDER

McCURN, Senior District Judge.

### *Introduction*

Presently before the court are three motions, upon which the court reserved decision following oral argument on July 8, 1999.[1] The first is a motion brought by the plaintiff-intervenor, the United States

---

1. A number of motions were argued that day in this case. Oral decisions were rendered as to all of those motions, except the three enumerated above.

of America ("the United States"), wherein it is seeking to hold the State of New York ("the State") alone "jointly and severally liable for the entire amount of monetary damages incurred by the plaintiffs[.]" Plaintiff–Intervener, United States' Memorandum of Law in Support of its Motions in Limine ("U.S.Memo.") at 2. The second related motion is also brought by the United States, wherein it is seeking separate trials pursuant to Fed. R. Civ. Pro. 20(b) and 42(b). The third is a renewed motion by defendant Miller Brewing Company ("Miller Brewing" or "Miller"), individually and on behalf of the defendant class of individual landowners ("the Class"), seeking to decertify the Class.

Given the progress in settlement negotiations at that time, at the August 6, 1999 status conference, at the parties' urging, the court agreed to hold in abeyance any rulings on these motions. With a December 2, 1999 trial date firmly in place, and given the current uncertain state of the negotiation process, however, the time has come, as the parties agree, to resolve these outstanding issues.

To that end, on September 2, 1999, the court conducted a telephone conference with all counsel. After hearing additional argument, the court indicated that it intends to adhere to the December 2, 1999 trial date and to proceed with the damage phase of this litigation; but at that time the only defendant will be the State of New York.[2] Set forth below are the court's reasons for proceeding in this fashion. Also set forth below are the court's rea-

sons for refusing to hold the State jointly and severally liable for the entire amount of damages sustained by the plaintiffs in this action, and for declining to decertify the defendant class of landowners at this time.

### Discussion

### I. Joint and Several Liability

To avoid the possibility of conducting separate jury trials with respect to the approximately 7,000 private individual landowner defendants, as well as the four non-State defendants,[3] the United States[4] is seeking a ruling that the State is "both jointly and severally liable for the *entire amount of monetary damages* that the plaintiffs have incurred because of the wrongful dispossession and occupation of their lands[.]" U.S. Memo. of Law at 2 (emphasis added). The thrust of the United States' argument is that, as the purchaser of the subject land in 1795 and 1807, the State is the original tortfeasor and as such is liable not only for the damages sustained by plaintiffs as a result of those initial Nonintercourse Act violations, but also for the ensuing damages which they have sustained in connection therewith over the past approximately two hundred years.

The defendants agree that the goal of this motion is laudable. *See* Letter of Feeherry to Court of 6/23/99 ("Feeherry Ltr."), at 1 ("[W]e support the general goals of the United States's motion[.]"); *see also* State of New York Defendants'

---

**2.** As discussed more fully in this court's July 1, 1999 decision, the State itself was not actually named as a defendant in this action. *See Cayuga Indian Nation of New York v. Cuomo*, Nos. 80–CV–930, 80–CV–960, 1999 WL 509442, at *3–*4 (N.D.N.Y. July 1, 1999) ("*Cayuga IX*"). Nonetheless, the court has construed the United State's complaint in intervention to include the State as a defendant. *See id.* In any event, all references herein to "the State" shall be read as including not only the State itself, but also the remaining State agencies and individual State agency heads in accordance with *Cayuga IX.*

**3.** The non-State defendants are the Counties of Cayuga and Seneca ("the Counties"); New York State Electric & Gas Corporation; Miller Brewing; and the defendant class of individual landowners, which is currently being represented by counsel for Miller Brewing in accordance with an earlier decision of this court. *See Cayuga Indian Nation v. Carey*, 89 F.R.D. 627 (N.D.N.Y.1981).

**4.** The Cayugas join in this motion, as is evidenced by the remarks of their counsel during oral argument. *See generally* Transcript (July 8, 1999) ("Tr.I").

Memorandum in Opposition to the United States' Motion in Limine to Hold New York Jointly and Severally Liable for Damages and to Conduct Separate Trials ("State Memo.") at 16 ("[T]he State believes that pursuit of claims against individual landowners is both unfair and impractical."). They disagree with the United States, and to some extent among themselves, however, as to how to accomplish this goal.

Anticipating that granting the United States' motion as to joint and several liability will not expand their liability, the Counties do not oppose the same. Likewise, Miller Brewing does not oppose a ruling that "the State may be held responsible for the entire amount of plaintiffs' damages[.]" Feeherry Ltr. at 2. But as Class representative, Miller strenuously argues that *"no one member* of the Class can be held liable for all damages[ ]" because "individual Class members may only be held accountable for damages, if at all, under a trespass theory for the land they occupy, and for the amount of time they occupied it[.]" *Id.* at 1. Thus, Miller further argues that "while the State may be held responsible for the entire amount of plaintiffs' damages, no other defendant, and specifically no other member of the Class, is jointly and severally liable with the State, nor is the *entire* Class jointly and severally liable with the State." *Id.* at 2 (emphasis added). In light of the foregoing, not only is Miller strongly urging the court to deny this motion, it is also requesting a court order "[m]aking clear that no other defendant besides the State can be held responsible for all damages." *Id.*

Not surprisingly, the State opposes the United States' motion. Noting that the United States' joint and several liability argument is premised upon the theory of common law trespass, the State offers two reasons why it should not be held jointly

and severally liable for the entire amount of damages sustained by plaintiffs, the Cayuga Indian Nation of New York and the Seneca Cayuga Tribe of Oklahoma (collectively referred to throughout as "the Cayugas"). First, although it is willing to admit that "the Cayugas may have had the right to possess the land up to the 1795 treaty," the State is taking the position that they "did not have *possession* of the land as that term is understood in relation to a trespass action after the State acquired the land." State Memo. at 10–11 (citation omitted). Hence, noting that possession of and title to land are two separate aspects of property rights, the State argues that the Cayugas do not have a remedy based upon common law trespass because they were not in possession of the land at the time of the trespass. *Id.* at 8. Second, the State argues that even if the Cayugas have a viable trespass claim, the harms here are divisible or distinct and hence the doctrine of joint and several liability does not apply. Although the United States' joint and several liability argument is not couched in terms of ejectment,[5] the State further asserts that it cannot be held jointly and severally liable for mesne profits under such a theory because it can only be held liable for ejectment damages for that portion of the subject land which it currently possesses.

Finally, even though the State does not believe that either the common law theory of trespass or ejectment provides a basis for a finding of joint and several liability, it does not disagree with the goal of this motion by the United States. The State would achieve that goal, however, by severely limiting the amount of damages which the Cayugas could recover from it. In particular, despite this court's prior ruling that recoverable damages will not be restricted solely to the fair market value of the subject property at the date of taking,[6]

---

**5.** Perhaps the United States does not frame this argument in terms of ejectment in recognition of the fact that this court recently elimi-

nated ejectment as a remedy in this case. *See Cayuga IX,* 1999 WL 509442, at * 17–30.

**6.** *Cayuga Indian Nation of New York v. Pataki,* Nos. 80–CV–930, 80–CV–960, 1999 WL

the State posits that literally thousands of individualized trials can be avoided by proceeding with a trial of damages against the State alone, and limiting recovery in such a trial to those damages which the Cayugas sustained as a result of the 1795 and 1807 violations of the Nonintercourse Act, 25 U.S.C. § 177. Then, perhaps realizing that those damages most likely would be wholly inadequate, relying upon *Cayuga VIII*, the State suggests that through prejudgment interest the court can adjust that award to ensure that the Cayugas receive "just compensation." *See* State Memo. at 16, n. 9.

In resolving this motion, there is no need to become mired down in whether, as the State asserts, the Cayugas have a viable claim for trespass or ejectment, or both. As to ejectment, given this court's ruling that ejectment is not available as a remedy in this action, any discussion of the same is moot, whether couched in terms of liability or damages. Furthermore, it is too late to focus, as does the State, on whether the United States can "*maintain an action for trespass.*" *See* State Memo.

at 11 (emphasis added). The State's repeated emphasis on liability, *see id.* at 8, 10 and 11, misses the mark when, broadly stated, the issue is how to fashion relief for liability which was established years ago. Given the limited focus of the court's inquiry on this motion, at this late date in the proceedings, it will not revisit the issue of liability in any form. Joint and several liability has no place in this litigation; not, as the State asserts, because the Cayugas have failed to state a viable cause of action for trespass, but because (1) such a finding would be manifestly inequitable; (2) the injury here is divisible; and (3) the non-State defendants are, at most, independent, successive tortfeasors.[7]

Before elaborating on these reasons, the court is compelled to comment, once again, upon the unique nature of this case, especially in its current posture. As the parties are well aware, the Cayugas are seeking to enforce a "*federal* common law" right of action for violation of their possessory property rights, *see Oneida County, New York v. Oneida Indian Nation of New York State*, 470 U.S. 226, 235, 105

---

224615, at *5–18 (N.D.N.Y. April 15, 1999) ("*Cayuga VIII* ").

**7.** Interestingly, none of the pertinent complaints contain any specific allegations as to joint and several liability. The most that can be said in that regard is that the complaints uniformly allege:

> Defendants and each member of their class assert and claim either a possessory interest in portions of the Original Reservation lands or the right to extract or remove timber, oil, gas, coal, other minerals or any other matter of value from said lands. All of the defendants are in trespass; .... The defendants are keeping plaintiffs out of possession of their land in violation of the common law and 25 U.S.C. § 177 (The Non–Intercourse Act).

Cayuga Indian Nation Co. at 23, ¶ 50; Seneca Cayuga Tribe Amended Co. at 8, ¶ 50; and U.S. Co. in Intervention at 5, ¶ 12. Tempting as it is, the court will not disregard the United States' joint and several liability argument due to this lack of specificity in pleading. It is possible to infer from these complaints, particularly when read as whole, that the Cayugas and the United States are asserting

joint and several liability. Therefore, the fact that the plaintiff parties were not explicit in pleading this theory does not preclude the United States from making that argument on this pre-trial motion. *Cf. Friedman v. Lawrence*, No. 90 Civ. 5584, 1991 WL 206308, at *3 (S.D.N.Y. Oct. 2, 1991) (plaintiff's allegations that all of the defendants, except one, jointly misrepresented to him the material facts with respect to an investment decision, were sufficient to demonstrate that the nature of the asserted liability was joint and several, even though the plaintiff did not specify in his complaint whether he sought to impose liability on that basis). This is especially so given the liberal pleading which the Federal Rules of Civil Procedure permit, including the ability of a party under Fed.R.Civ.P. 15(b) to amend its pleadings to conform to the evidence when issues "are tried by express or implied consent of the parties[.]" *See* Fed. R.Civ.P. 15(b). Although plaintiffs' failure to explicitly plead joint and several liability does not preclude them from relying upon that theory on this motion, as discussed above, the court is convinced that the United States' reliance upon joint and several liability in this context is misplaced.

S.Ct. 1245, 1252, 84 L.Ed.2d 169 (1985) ("*Oneida V*") (emphasis added), as well as seeking to vindicate their rights under the Nonintercourse Act. Unfortunately, that Act is silent as to remedies, thus leaving courts to resort to the common law as a means of "assist[ing] ... in formulating a *statutory* [Nonintercourse Act] damage remedy." *See Oneida Indian Nation of New York v. Oneida County*, 719 F.2d 525, 530 n. 6 and 540 n. 17 (2d Cir.1983), *aff'd in part, rev'd in part, on other grounds, Oneida V*, 470 U.S. 226, 105 S.Ct. 1245, 84 L.Ed.2d 169. Therefore, in molding a remedy in the present case and in structuring a manageable trial, in the court's opinion it may well be appropriate, and indeed necessary, to fashion a federal common law remedy, which although having some resemblance to remedies available for common law torts such as trespass, is a remedy uniquely tailored to fit the needs of this unparalleled land claim litigation. As the discussion below demonstrates, however, and has been evident for some time as the issue of remedies has come to dominate this litigation, common law principles, whether tort-based or not, are not readily transferrable to this action. It is through this lens which the court has considered the arguments in support of and in opposition to the United States' joint and several liability argument.

Joint liability "'arises when a tortious act is committed by several persons acting in concert.'" *Thomas v. Sclavo, S.P.A.,* No. CIVA94CV1568RSP/DNH, 1998 WL 51861, at *4 (N.D.N.Y. Feb. 4, 1998) (quoting *In re Uranium Antitrust Litigation,* 617 F.2d 1248, 1257 (7th Cir. 1980)). "'It means that each tortfeasor is entirely responsible for the damage resulting from that concerted conduct.'" *Lite–Up Corporation v. Sony Music Entertainment, Inc.,* No. 97Civ.1546, 1999 WL 436563, at *3 (S.D.N.Y. June 24, 1999) (quoting *Uranium Antitrust,* 617 F.2d at 1257). Thus, in what Judge Pooler terms a "true joint liability" situation, *Thomas,* 1998 WL 51861, at *4, "'[a] successful

plaintiff may look to any one of the defendants for full satisfaction of a damage award.'" *Id.* at *4 n. 1 (quoting *Uranium Antitrust,* 617 F.2d at 1257). "Implicit in this analysis is the notion that the liability of each party is dependent on the liability of the other—that is, that it would be logically inconsistent for one to be held liable while the other is not." *Lite—Up,* 1999 WL 436563, at *3 (citing *Uranium Antitrust,* 617 F.2d at 1257–58; and 10 J. MOORE, ET AL., MOORE'S FEDERAL PRACTICE § 55–45 to 46 (3d ed.1999)).

On the other hand, "'[s]everal or independent liability ... arises when one defendant is found to have committed a tort without the aid of other defendants.'" *Thomas,* 1998 WL 51861, at *4 n. 2 (quoting *Uranium Antitrust,* 617 F.2d at 1257). Consequently, "a defendant held severally liable is only liable for that portion of the plaintiff's damages that reflect the percentage of comparative responsibility assigned to that defendant." Restatement (Third) of Torts § 21 cmt. a (Proposed Final Draft (Revised)) (March 22, 1999). However, when, "[l]iability is said to be 'joint *and* several', [it] mean[s] that *each party* is *individually liable* to plaintiff *for the whole of the damage.*" *Hecht v. City of New York,* 60 N.Y.2d 57, 62, 467 N.Y.S.2d 187, 190, 454 N.E.2d 527 (1983) (citing Restatement, Torts 2d, § 875, and Comment [*b*]) (emphasis added); *see also Gillette Co. v. Wilkinson Sword, Inc.,* 795 F.Supp. 662, 664 (S.D.N.Y.1992) (citing Restatement (Second) of Torts, § 875) ("[T]he general rule in tort law is that joint tortfeasors are liable for the entire harm caused.").

There are several obstacles to a finding of joint and several liability in this case. Perhaps the most significant obstacle, though, and one which the United States conveniently overlooks, is that by its very nature such a finding has the potential for a truly devastating result in that any *one* of the approximately 7,000 individual landowners could be held liable for the *entire* amount of damages sus-

tained by the Cayugas for the past 200 years or so. By any calculation that would be an appreciable sum of money, especially when viewed in terms of individual responsibility for the same. Stated somewhat differently, the possibility exists, albeit remote given recent assurances by the State and federal governments,[8] that if the State is held jointly and severally liable, any one of these defendants, including an individual landowner whose financial resources pale in comparison to the State's, would be financially responsible for an astronomical sum of money. Thus, although there is a strong argument to be made that the State properly could be held liable for *all* of the damages sustained by the Cayugas, it would be absurd to hold that a single present day landowner could likewise be held liable for all of these damages. Yet, that would be a necessary corollary of a finding of joint and several liability in this case. Accordingly, if for no other reason, given the relative equities and because it would be fundamentally unfair to hold otherwise, the court refuses to find that the State of New York is jointly and severally liable for the entire amount of the damages sustained by the Cayugas.

The inequities of a finding of joint and several liability, while great, are not the only basis for the court's refusal to apply that doctrine in this case. Joint and several liability arises "[w]hen two or more tortfeasors act concurrently or in concert to produce a *single injury* [.]" *Ravo v. Rogatnick*, 70 N.Y.2d 305, 308, 520 N.Y.S.2d 533, 534, 514 N.E.2d 1104 (1987) (citations omitted) (emphasis added); *see also Mazyck v. Long Island R. Co. (LIRR)*, 896 F.Supp. 1330, 1333 (E.D.N.Y.1995) (quotation marks, citations and footnote omitted) ("The law is clear that where there is but one indivisible injury caused by the joint or concurrent acts of two [or more] tortfeasors, each tortfeasor is jointly and severally liable for the entire amount of damages."). Here, the United States simply assumes the existence of a single, indivisi-

ble injury. *See* U.S. Memo. at 8. In the court's view, however, the Cayugas have not sustained a single, indivisible injury, but rather their injury is more accurately viewed as divisible.

Without question, division or allocation among the defendants of the damages sustained by the Cayugas will not be an easy task, but neither will it be impossible. If necessary and appropriate, the Cayugas' damages are, to some extent, capable of reasonable or practical division or allocation. *Cf. U.S. v. Imperial Irrigation District*, 799 F.Supp. 1052, 1069–70 (S.D.Cal. 1992), (various California water districts were severally liable in trespass to the Torres–Martinez Indians for flooding of tribal lands because it was possible to apportion among those districts the percentage of water attributable to each which contributed to the flooding). For example, the harm sustained by the Cayugas— wrongful dispossession of their property for over 200 years—is capable of division in that it is "conveniently severable in point of time." *See* Restatement (Second) Torts § 433A, cmt. c (1965). Furthermore, as the State accurately observes, the Cayugas' damages "can be apportioned to various time periods and are discrete harms based upon who possessed the land at the time." State Memo. at 13. Thus, although the aggregate harm to the Cayugas is the loss of nearly 65,000 acres of land, it is possible to apportion that loss. The fact that the defendants' acts (holding the subject property to the detriment of the Cayugas) were done separately and independently bolsters a finding that the Cayugas' injuries are divisible, thus rendering joint and several liability inapplicable.

Even if the court were to accept the notion that the Cayugas sustained a single, indivisible injury, it still would not find that this is a situation mandating joint and several liability. As the New York Court of Appeals has explained on more than one

---

8. *See* discussion *supra* at 76.

occasion, the rationale for joint and several liability is that "concerted wrongdoers are considered 'joint tort-feasors' and in legal contemplation, there is a joint enterprise and a mutual agency, such that the act of one is the act of all and liability for all that is done is visited upon each[.]" *Ravo,* 70 N.Y.2d at 309, 520 N.Y.S.2d at 535, 514 N.E.2d 1104 (citing, *inter alia, Bichler v. Eli Lilly & Co.,* 55 N.Y.2d 571, 580–81, 450 N.Y.S.2d 776, 778–80, 436 N.E.2d 182 (1982)). But "where multiple tort-feasors neither act in concert nor contribute concurrently to the same wrong, they are not joint tort-feasors; rather, their wrongs are independent and successive[.]" *Id.* (internal quotation marks and citations omitted). Of particular significance is that "[u]nder successive and independent liability; ..., the initial tort-feasor may well be liable to the plaintiff for the entire damage proximately resulting from his own wrongful acts ..., including aggravation of injuries by a successive tort-feasor[.]" *Id.* (citations omitted).

Regardless of whether defendants' actions are viewed in terms of a "joint enterprise," "mutual agency," or "concerted" conduct, there is a complete absence of allegations, and indeed proof, which would satisfy this basic requirement of joint and several liability. As to a joint enterprise, " '[e]ssential to [such a] finding ... is the equal right of each member to direct or control others in respect [there]to[.]' " *Upper Hudson Planned Parenthood, Inc. v. Doe,* No. 90–CV–1084, 1999 WL 615872, at \*12 (N.D.N.Y. Aug. 11, 1999) (quoting *Chen v. Georgetown University,* 685 F.Supp. 83, 85 (S.D.N.Y.), *aff'd without pub'd opinion,* 863 F.2d 45 (2d Cir.1988)). Obviously, this control element is completely lacking here. Thus, the United States cannot rely upon a joint enterprise theory to support its joint and several liability argument.

To the extent that that United States' joint and several liability argument is premised upon a theory of concerted-action liability, it fares not better. Under New York law, the elements of concerted-action liability are: "(1) an express or tacit agreement 'to participate in a common plan or design to commit a tortious act,' (2) tortious conduct by each defendant, and (3) the commission by one of the defendants, in pursuance of the agreement, of an act that constitutes a tort." *Pittman by Pittman v. Grayson,* 149 F.3d 111, 122 (2d Cir.1998) (quoting *Rastelli v. Goodyear Tire & Rubber Co.,* 79 N.Y.2d 289, 295, 582 N.Y.S.2d 373, 375, 591 N.E.2d 222 (1992)), *cert. denied,* —— U.S. ——, 120 S.Ct. 59, 145 L.Ed.2d 51 (1999). Not only are allegations of such conduct conspicuously absent from plaintiffs' complaints, but there is nothing before the court that would satisfy any one of these requirements, let alone all three. *Cf. United States v. Hooker Chemicals & Plastics Corp.,* 722 F.Supp. 960, 971 (W.D.N.Y.1989) (finding no genuine issue of material fact as to joint and several liability under the common law of public nuisance, the court granted summary judgment in plaintiff's favor on that claim). Indeed, it would have been impossible for the current landowners to have acted concurrently or in concert with the State in terms of the initial Nonintercourse Act violations, which in large part form the basis for liability herein, because it is safe to say, none of those defendants were present at the time of those violations.

The court is aware that simultaneous conduct is not, as the United States points out, critical to a finding of joint and several liability, *see Ravo,* 70 N.Y.2d at 310, 520 N.Y.S.2d at 535, 514 N.E.2d 1104; but where less than simultaneous conduct has been found to support a finding of joint and several liability, the injury is indivisible. *See, e.g., Hawkes v. Goll,* 281 N.Y. 808, 24 N.E.2d 484 (1939) (opining that two defendants, who separately injured plaintiff while driving different cars could be joint tortfeasors, even though their wrongful actions "were not precisely concurrent"). In the present case, as already discussed, that is not the situation. In

short, the court declines to invoke the doctrine of joint and several liability here.

That is not to say, however, that ultimately the State will not be held fully responsible for all of the damages which the Cayugas may recover herein. At least at this juncture, it certainly appears, as the United States urges, that as the party responsible for the initial Nonintercourse Act violation, which set this whole debacle in motion, the State could be deemed an original or primary tortfeasor. Therefore, arguably, the State could be held responsible for all such damages on the theory that by originally violating the Nonintercourse Act, it provided the means through which many, if not all, of the non-State defendants, derived title and have thus continued to hold the subject property in derogation of the Cayugas' rights to the same. *See Zenith Bathing Pavilion v. Fair Oaks S.S. Corp.*, 240 N.Y. 307, 313, 148 N.E. 532, 534 (1925) (Cardozo, J.) ("[a] persuasive case" was "made out against" the defendant, "as the author of the trespass," that it was "liable as such for all the ensuing damage, irrespective of later transfers[ ]"). Whether the foregoing actually occurs will, of course, depend upon the proof at the upcoming trial. In any event, for all of these reasons, the court hereby denies the United States' motion seeking to hold the State jointly and severally liable for all of the damages sustained by the Cayugas.

The court hastens to add that it is fully cognizant that this motion was borne out of an attempt by the United States to simplify the upcoming trial of this matter, and the court wholeheartedly endorses that goal. However, the court cannot condone the United States' chosen method— the imposition of joint and several liability. The court refuses to sacrifice the rights of the individual landowners for the strategic convenience of the United States, or, for that matter, for the strategic convenience of any party; yet that is precisely what could happen if the court were to find the doctrine of joint and several liability applies here.

## II. Separate Trials

As an additional means of attempting to avoid 7,000 or so separate jury trials, the United States also is seeking to first proceed to trial against the State and then, if necessary, separate subsequent trials against *all* of the remaining non-State defendants. Granting this motion would, the United States argues, result in a "much more manageable and just[ ]" resolution of this action. U.S. Memo. of Law at 12.

As with the joint and several liability motion, the Counties do not oppose this motion by the United States, so long as the court grants the former. If the court does not hold that the State is jointly and severally liable for the entire amount of plaintiffs' damages, then the Counties oppose this motion because they are concerned as to the potential preclusive effect of any determinations made at the State's damages trial. Under this scenario, the Counties contend that they would be prejudiced by their inability to be heard, unless at the State trial they are "permitted to offer proof on all issues relating to damages and the method of valuation which could bind the Counties in the damages phase of this case." Letter of Dorr to Court of 6/22/99, at 2. In sum, if the court refuses to grant the United States' motion for joint and several liability on the part of the State, then the Counties contend that the court should deny this motion for separate trials.

Miller Brewing is taking the position that allowing the Cayugas "to proceed against the State for the full universe of damages[ ]" would obviate the need for separate trials. Feeherry Ltr. at 2. Miller reasons that if the State is obligated to the Cayugas for the entire amount of damages, "then the Court should also order that the [Cayugas] be barred from proceeding against any other member of the Class[,]" which "would effectively dismiss all other defendants from the case, promoting the goals of efficiency, judicial [sic] manageability, and fairness to the innocent mem-

bers of the Class." *Id.* Furthermore, because ostensibly "a judgment against the State for all damages would fully make whole the [Cayugas]," Miller Brewing maintains that an order of dismissal as to the non-State defendants is "almost compelled[.]" *Id.* Finally, if the court enters such an order, Miller will withdraw its renewed motion to decertify the defendant Class; otherwise it will not, because of the potential for judgments against individual Class members.

Absent a finding of joint and several liability, the State agrees with Miller Brewing that there is no basis for separate trials, but the State offers a different reason. Separate trials are not appropriate, contends the State, because the proof as to damages would be essentially the same at all trials, resulting in a substantial overlap in evidence between the first trial and the subsequent trials. Thus, in the State's opinion, "separate trials would not necessarily be more efficient." State Memo. at 18 (citations omitted). Interestingly, the State does not argue that it would be prejudiced in any way by separate trials.

The United States is moving for separate trials under both Fed.R.Civ.P. 20(b) and Fed.R.Civ.P. 42(b). The court's analysis will focus exclusively upon the latter Rule, however, given that "[a]side from emphasizing the availability of separate trials, Rule 20(b) has little significance inasmuch as the power granted the court therein also is provided by the much broader grant of discretion set forth in Rule 42(b)." 7 CHARLES ALAN WRIGHT, ARTHUR R. MILLER, MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 1660 (2d ed. 1986) ("FEDERAL PRACTICE").

"Fed.R.Civ.P. 42(b) permits a trial court, 'in furtherance of convenience or to avoid prejudice ... [t]o order a separate trial of any claim ... or issue[.]'" *Blyden v. Mancusi,* 186 F.3d 252, 268 (2d Cir. 1999) (citing *Vichare v. AMBAC Inc.,* 106 F.3d 457, 466 (2d Cir.1996)). A separate trial is also permitted under that Rule when it "will be conducive to expedition

and economy[.]" Fed.R.Civ.P. 42(b). Thus, Rule 42(b) gives district courts broad discretion. Significantly, "[a ]ny one of these factors alone can constitute a sufficient basis for a separate trial." *Dayton Monetary Associates v. Donaldson, Lufkin & Jenrette Securities Corporations,* No. 91 CIV.2050, 1999 WL 159889, at *1 (S.D.N.Y. March 22, 1999) (emphasis added) (citing *Ismail v. Cohen,* 706 F.Supp. 243, 251 (S.D.N.Y.1989), *aff'd on other grounds,* 899 F.2d 183 (2d Cir.1990)).

A court's sweeping authority under Rule 42(b) encompasses the right to order separate trials "of any claim, cross-claim, counterclaims, third-party claims, or issues[.]" Fed.R.Civ.P. 42(b). In other words, "Rule 42(b) provides the district court with discretion to subdivide the case in whatever manner seems dictated by the circumstances." FEDERAL PRACTICE § 2389. Nonetheless, "[s]eparate trials ... remain the exception rather than the rule." *Bowers v. Navistar International Transportation Corp.,* No. 88 CIV 8857, 1993 WL 159965, at *1 (S.D.N.Y. May 10, 1993) (citations omitted). A separate trial of a separate issue may be proper though "where ... litigation of the first issue might eliminate the need to litigate the second issue[.]" *Amato,* 170 F.3d at 316 (citation omitted); *see also HCC, Inc. v. R H & M Machine Co.,* No. 96 CIV. 4920, 1998 WL 849417, at *1 (S.D.N.Y. Dec. 4, 1998) (citing § 2389 *Vichare,* 106 F.3d at 466–67) ("[B]ifurcation is most appropriate where determination of one issue could wholly eliminate the need to try another complicated or time-consuming issue[.]"). Indeed, "[i]n a complex case with complex issues, justice is often best served if issues are separated[,]" and separate trials conducted. *See Ismail,* 706 F.Supp. at 251. Thus, this procedural mechanism, which the Second Circuit has aptly described as a "powerful legal tool[,]" *U.S. v. Alcan Aluminum Corp.,* 990 F.2d 711, 720 (2d Cir. 1993), serves, among others, the worthy goals of "'isolat[ing] issues to be resolved, avoid[ing] lengthy and perhaps needless

litigation ... [and ... ] encourag[ing] settlement discussions[.]' " *Bowers v. Navistar International Transportation Corp.,* No. 88 CIV 8857, 1993 WL 159965, at *1 (S.D.N.Y. May 10, 1993) (quoting *Alcan Aluminum Corp.,* 990 F.2d at 720).

Here, as the moving party, the United States has the burden of showing that separate trials are necessary in light of the factors enumerated above. *See Buscemi v. Pepsico, Inc.,* 736 F.Supp. 1267, 1271 (S.D.N.Y.1990) (citation omitted). On appeal, a district court's decision to grant or deny a motion for separate trials is subject to the relatively deferential abuse of discretion standard of review. *See Vichare,* 106 F.3d at 466 (citation omitted).

 In the present case, although both the United States and the State cite to several cases involving Rule 42(b) motions, which they believe support their respective positions herein, the court does not find these cases to be particularly helpful "because [that] Rule ... simply does not give rise to a bright-line test." *Monaghan v. SZS 33 Associates, L.P.,* 827 F.Supp. 233, 245 (S.D.N.Y.1993) (citation omitted). Instead, in determining the propriety of the United States' request for separate trials, the court will examine the present record and the parties' legal positions in light of the unique nature of this case. *See id.* When that is done, as will be more fully discussed below, the court is convinced that the interests of justice will best be served by allowing the plaintiffs to first proceed in a separate trial against the State of New York as the sole defendant.

As previously alluded to, the only direct opposition to this motion comes from the State which argues, in essence, that separate trials would be inefficient given that it intends to offer basically the same proof at any and all trials conducted in connection with this action. The possibility of a substantial overlap in proof is remote indeed, however, given the repeated assurances by both the State and federal governments that if the court grants this motion for a separate trial, that will end this litigation.

During the July 8, 1999 argument of this motion, counsel for the United States emphatically stated that the United States does not "inten[d] ... to seek a judgment against anyone else, not the 7,000 individual landowners, not the Counties, just New York[.]" *See* Tr.I at 84; *see also id.* at 60 and 67 (Counsel for the United States stated in open court that if it obtains a judgment against the State under the theory of joint and several liability, "the case would end right there[.]"); and *id.* at 67 ("[T]here is no need for these 7,000 individuals to ever go to court."). More recently, during the September 2, 1999 phone conference, the United States reiterated this position, unambiguously stating that if plaintiffs are allowed to proceed first in a trial against the State of New York, and "if a judgment [is] found against New York for the liability incurred, [the United States] would *not* go after the landowners." Transcript (Sept. 2, 1999) ("Tr. II") at 11 (emphasis added);

In recent months, the State of New York has voiced a similar view. *See, e.g.,* Tr. I at 73 (counsel for the State, "for the record," dispelling the notion that it intends to "go against" the non-State defendants.); Tr. I at 89 ("[T]he State has absolutely no interest in maintaining a trial with the individual landowners[.]"). Such assurances have not been limited to those made by counsel in court proceedings. Statements of a similar ilk have been publicly echoed by Governor George E. Pataki. For example, on August 27, 1999, the Governor openly "pledged his support to the property owners in the Cayuga Indian land claim dispute[,]" going so far as to state that he "will only support a settlement that protects every homeowner and their property rights[.]" Scott Rapp, *Pataki supports Cayuga property owners,* The Post–Standard, August 28, 1999. Given that unequivocal statement by the State's highest elected official, it is inconceivable to this court that following a trial of this action against the State alone, the State would turn around and seek contri-

bution and/or indemnification against its own citizens—citizens which have lived with the uncertainty of this litigation for almost twenty years, and citizens which for the most part are merely victims of history.

Furthermore, although regrettably the Cayugas have not yet agreed to dismiss their claims against the individual landowners, it appears that they, too, do not intend to pursue such claims if they are permitted to proceed against the State alone. *See* Tr. II at 16–17 (Counsel for the Cayuga Nation opined, "as a practical matter if there is one trial against the State that will be it."). In light of the foregoing, because the likelihood of future subsequent trials seems all but moot, the State's argument that separate trials should not be conducted because of a potential overlap in proof is wholly unfounded.

Moreover, allowing plaintiffs to proceed to trial first against the State of New York would obviate the need for approximately 7,000 additional trials. Thus, a separate trial against the State would serve one of the primary purposes of Rule 42(b) which is "a just and expeditious final disposition of th[is] litigation[.]" *See* FEDERAL PRACTICE § 2388. Proceeding in this fashion will not only eliminate the need to try a *single* additional issue; almost certainly, a trial against the State only will eliminate the need to try literally *thousands* of additional issues. Consequently, it is difficult to imagine a case where the goals of a separate trial, as set forth in Rule 42(b), would be better served than the present one. Moreover, as the United States readily concedes, a finding of joint and several liability is *not* an absolute prerequisite to a finding that the present litigation could be handled most expeditiously and efficiently by proceeding first with a separate trial against the State. *See* Tr. II at 4. Accordingly, the court grants the United States' motion for a separate trial.

If it is necessary to proceed with damage trials with respect to the other, non-State defendants, including the approximately 7,000 individual landowners, such trial or trials will be conducted at a later date. The necessity of future trials seems highly unlikely, though, given the pledges by the Cayugas, the United States, and by the State, that once the matter is resolved as against the State, the parties just named will not be pursuing any further claims in connection with this litigation. In the event that future trials are necessary, the parties should keep in mind, especially the Counties, that the State may pursue claims of contribution and/or indemnification as against the Counties. The same is also true with respect to the other non-State defendants.

### III. Class Decertification

Having determined that separate trials will be conducted, with the first trial proceeding against the State as the sole defendant, there is no need for the court the decide the decertification issue at this juncture. Consequently, Miller Brewing's motion to decertify the Class is denied without prejudice to renew.

### Conclusion

Today the court has attempted to craft a procedure whereby the issue of damages can be resolved without a morass of complicated and lengthy litigation which could easily extend well into the next century. To avoid such a prospect, the court has decided that a single trial against the State of New York as the sole defendant is the only practical way to proceed here. At the same time, however, although the court believes such concerns to be unfounded, it is acutely aware of the non-State defendants' concerns as to the potential preclusive effect such a trial could have on future, subsequent trials against those defendants. As it has since the possibility of a separate trial against the State first arose, the court stresses that the non-State defendants, which by court order are not participating in this upcoming trial, are not bound in any way, such as through the application of collateral estoppel or res

judicata, by any determinations made in the State's damage trial.

IT IS SO ORDERED.